# EXHIBIT 1

# U.C.L.A. Law Review

## The Venue Shuffle: Forum Selection Clauses and ERISA

Christine P. Bartholomew & James A. Wooten

**ABSTRACT**

Forum selection clauses are ubiquitous. Historically, the judiciary was hostile to contracts limiting a plaintiff's venue options. The tide has since turned. Today, lower courts routinely enforce such clauses. This Article challenges this reflexive response in the special context of ERISA cases. It mines ERISA's statutory text, rich legislative history, and historical context to supply an in-depth exploration of ERISA's unique policy goal of providing employees "ready access to the Federal courts." The Article then explains how forum selection clauses undermine this goal and thus should be invalid under controlling Supreme Court jurisprudence.

**AUTHORS**

Associate Professor and Professor, University at Buffalo School of Law, the State University of New York. The authors would like to thank Anya Bernstein, Guyora Binder, Norman Stein, Jon Forman, Don Bogan, Mark DeBofsky, Jim Gardner, and attendees of the Seventh Annual Pension and Employee Benefits Conference at the University of Oklahoma College of Law for their comments. Special thanks to our research assistants, Samantha R. Podlas, Matthew Medoff, Charles R. Terranova, and Nicholas Frandsen.



## TABLE OF CONTENTS

Introduction...................................................................................................................................864
I. Venue Basics ...........................................................................................................................868
    A. Venue Rules and Forum Selection Clauses ....................................................................870
    B. Forum Selection Clauses and ERISA..............................................................................876
II. Forum Selection Clauses Conflict With the Policy Goals of ERISA................................880
    A. Clearing Obstacles to Protect Employees.......................................................................881
    B. Venue Options Throughout ERISA's Evolution ...........................................................889
    C. ERISA in Historical Context...........................................................................................892
        1. Pre-ERISA Law Voided Forum Selection Clauses.................................................893
        2. Contemporary Pension Benefit Actors Presumed Unenforceability.....................899
III. Reading ERISA to Protect the Interests of Employees......................................................903
Conclusion...................................................................................................................................909

## Introduction

In 1992, Chronic Fatigue Syndrome and Fibromyalgia[1] forced Janice Laakso to end her twelve-year career at Xerox.[2] After paying total disability benefits for almost fourteen years, Xerox stopped in 2006.[3] Ms. Laakso sued in the Central District of California.[4] After she went on disability, she suffered three heart attacks and an aneurism, thus necessitating she sue where she lived.[5] Unbeknownst to Ms. Laakso and after her disability began, Xerox amended its disability plan to add a forum selection clause limiting lawsuits to the Western District of New York, well over 2000 miles away.[6] Bedridden for days on end because of her disability, Ms. Laakso challenged the motion,

---

1. Laakso suffered from Chronic Fatigue Syndrome (CFS) and Fibromyalgia. In some medical circles, CFS remains a controversial diagnosis. This controversy has seeped into ERISA decisions. *See, e.g.,* Osobka v. MetLife, No. 16-12311, 2017 WL 3668498 (E.D. Mich. Aug. 25, 2017) (finding it was not arbitrary and capricious for an insurance company to deny Plaintiff's long-term disability (LTD) benefits claim even though Plaintiff's own treating physicians, themselves leading experts in the CFS field, opined that Plaintiff was disabled due to CFS).

2. Plaintiff's Opposition to Defendants' Motion to Dismiss or in the Alternative to Transfer Venue at 3:16–19, Laakso v. Xerox Corp., No.808-CV-00489 (C.D. Cal. June 22, 2008), 2008 WL 7120920 [hereinafter Laakso Opp]. In our research, we learned several published opinions spell the plaintiff's surname incorrectly. Her surname is Laakso, not Laasko. Notice of Motion and Motion by Defendants to Dismiss or in the Alternative to Transfer Venue at n.1, Laakso v. Xerox, 2008 WL 7120918 (C.D. Cal.) ("The Plaintiff's correct last name is 'Laakso,' but it will be referred to herein as 'Laasko' because the Complaint consistently so misnamed her." In this Article, we use the correct version unless citing a court document with the misspelling.").

3. *Id.* at 3:12. For 14 years, Xerox recognized and respected Ms. Laakso's medical diagnosis. It was not until March 2006 that the employer contended "her disability was no longer medically supportable." Laakso v. Xerox Corp., No. 08-CV-6376-CJS, 2011 WL 3360033, at *1 (W.D.N.Y. Aug. 3, 2011).

4. *See* First Amended Complaint for Benefits Under Employee Welfare Plan (ERISA), Declaratory Relief, & for Civil Penalties for Failure to Provide Documents (ERISA) ¶ 2, Laakso v. Xerox Corp., No. 808-CV-00498 (C.D. Cal. June 12, 2008), 2008 WL 7120919.

5. Laakso Opp., *supra* note 2, at 3:8.

6. Laasko v. Xerox Corp., 566 F. Supp. 2d 1018, 1020 (C.D. Cal. 2008). The forum selection clause specified the Rochester Division of the Western District of New York. Notably, there are only five judges sitting in that division. *District Judges,* U.S. Dist. Ct., W. D. of N.Y., http://www.nywd.uscourts.gov/district-judges [https://perma.cc/BL8R-5TL7]. Thus, by adding a forum selection clause, Xerox not only picked the forum but greatly narrowed the group of judges who would hear the case. Supporters of these clauses cite the ability to direct litigation to a handful of judges as a justification for enforcement. *See, e.g.,* Davidson v. Ascension Health Long Term Disability Plan, No. 6:16-CV-00193-RP-JCM, 2017 WL 8640929, at *7 (W.D. Tex. Feb. 1, 2017) (internal citation omitted); Klotz v. Xerox Corp., 519 F. Supp. 2d 430, 436 (S.D.N.Y. 2007).

arguing she had neither the ability nor the means to litigate in New York.[7] Nonetheless, the district court granted Xerox's motion.

Ms. Laakso is not alone. Benefit plans governed by ERISA cover more than 141 million participants and beneficiaries.[8] During the last two decades, more and more of these plans incorporate forum selection clauses, meaning more and more employees must sue in a distant forum handpicked by their employer.[9] The power to designate a court affects the course of litigation. Forum selection clauses shift litigation costs to plaintiffs and reduce settlement pressure on defendants.[10] They also threaten to deprive plaintiffs of witnesses who are unable or unwilling to travel to the more distant locale.[11] In some cases, a forum selection clause forecloses any realistic opportunity for a day in court.[12] Even for those able to continue with

---

7. Laakso Opp. at 4:13–21. No longer receiving benefits, Ms. Laasko lost her home and was living with a friend at the time of suit.

8. *See Fact Sheet: What is ERISA?*, U.S. DEP'T OF LABOR, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/what-is-erisa [https://perma.cc/7AUL-JE53] (providing figures from fiscal year 2013).

9. *See* Motion for Leave to File Brief & Brief of the Pension Rights Center as Amicus Curiae in Support of Petitioner at 2-3, Clause v. U.S. Dist. Ct., 137 S. Ct. 825 (2017) (No. 16-641), 2016 WL 7048330, at *2-3 [hereinafter Pension Rights Center Amicus Brief]; *It's Never Too Late for a Forum Selection Clause—Court Enforces Clause Added After the Plaintiff Retired*, LITTLER: ASAP (Feb. 19, 2013), https://www.littler.com/publication-press/publication/its-never-too-late-forum-selection-clause-%E2%80%93-court-enforces-clause [https://perma.cc/T8WQ-CQ2F] (discussing the increased use of such clauses in pension plans); *see also, e.g.*, David A. Pratt, *The Effect of Forum Selection Clauses in ERISA Litigation*, 24 J. PENSION BENEFITS, 24 (2017) (noting the Department of Labor only took up the issue after 2000 because that is when plans started adopting forum selection clauses). For discussion of other sponsor initiatives "to constrict access to the federal courts," see Dana Muir & Norman Stein, *Two Hats, One Head, No Heart: The Anatomy of the ERISA Settlor/Fiduciary Distinction*, 93 N.C. L. REV. 459, 525-26 (2015).

10. *See, e.g.*, Edward A. Purcell, Jr., *Geography as a Litigation Weapon: Consumers, Forum-Selection Clauses, and the Rehnquist Court*, 40 UCLA L. REV. 423, 490 n.253 (1992) ("Although forum-selection clauses will reduce the settlement costs of companies, that reduction will not reduce the aggregate costs of injuries. Rather, a decrease in settlement payments will simply mean that those who suffer losses will bear higher percentages of the costs of those losses."); Dan Schechter, *Despite Supreme Court Ruling Endorsing Enforcement of Forum Selection Clauses, Bankruptcy Court Holds That German Forum Clause Is Invalid Due to Forum Non Conveniens*, 2017–46 COMM. FIN. NEWS. NL 88 (Nov. 20, 2017) (discussing increased discovery costs associated with a forum selection clause).

11. *See, e.g.*, Alpha Sys. Integration, Inc. v. Silicon Graphics, Inc., 646 N.W.2d 904, 909 (Minn. Ct. App. 2002) (enforcing forum selection clauses despite plaintiff's evidence that the transfer impacted plaintiff's ability to call certain witnesses); Arthur Young & Co. v. Leong, 383 N.Y.S.2d 618, 619 (N.Y. App. Div. 1976) (stating that by agreeing to a forum, the parties "obviated considerations of inconvenience to a party or a witness"), *appeal dismissed*, 40 N.Y.2d 984 (N.Y. App. Div. 1976).

12. *See* Lee Goldman, *My Way and the Highway: The Law and Economics of Choice of Forum Clauses in Consumer Form Contracts*, 86 NW. U. L. REV. 700, 722 (1992) (discussing how

litigation, the chance of success drops upon transfer.[13]   As one scholar concludes, "The gains that *International Shoe* and its progeny made toward allowing plaintiffs to sue in their home jurisdictions [are] largely recaptured by corporations in a frenzy to lower legal costs."[14]  This result is particularly troubling in ERISA cases because plaintiffs "often are elderly, sick, or disabled."[15]

This raises the focal question of this Article: Should courts enforce ERISA forum selection clauses against participants and beneficiaries?  The two federal courts of appeals[16] and a large majority of the district courts that have considered this issue sided with enforcement.[17]  Other decisions treat such clauses as contrary to Congress's goal of clearing procedural hurdles that

---

some "may view enforcement of forum clauses as depriving them of their day in court, not to mention compensation for, perhaps, grievous injury." (footnote omitted)). Current interpretations of ERISA already burden plaintiffs with an exhaustion requirement and deferential judicial review of claims denials. *See, e.g.*, Brendan S. Maher, *The Affordable Care Act, Remedy, and Litigation Reform*, 63 Am. U. L. Rev. 649, 656-62 (2014); James A. Wooten, *A Reflection on ERISA Claims Administration and the Exhaustion Requirement*, 6 Drexel L. Rev. 573, 575-76 (2014).

13.   *See, e.g.*, Kevin M. Clermont & Theodore Eisenberg, *Exorcising the Evil of Forum-Shopping*, 80 Cornell L. Rev. 1507, 1511-12 (1995) ("In recent federal civil cases, the plaintiff wins in 58% of the nontransferred cases that go to judgment for one side or the other, but wins in only 29% of such cases in which a transfer occurred.").

14.   John McKinley Kirby, *Consumer's Right to Sue at Home Jeopardized Through Forum Selection Clause in* Carnival Cruise Lines v. Shute, 70 N.C. L. Rev. 888, 915 (1992) (footnotes omitted); *see also* Linda S. Mullenix, *Another Choice of Forum, Another Choice of Law: Consensual Adjudicatory Procedure in Federal Court*, 57 Fordham L. Rev. 291, 296–97, 362 (1988) (discussing how such clauses prioritize freedom of contract over due process).

15.   Pension Rights Center Amicus Brief, *supra* note 9, at 1; *cf.* Christine P. Bartholomew, *Redefining Prey and Predator in Class Actions*, 80 Brook. L. Rev. 743, 749 (2015) (discussing the role of vulnerability in legal theory).

16.   *In re* Mathias, 867 F.3d 727 (7th Cir. 2017); Smith v. Aegon Cos. Pension Plan, 769 F.3d 922 (6th Cir. 2014); *see also In re* Jefferson A. Robertson, No. 18-2812, slip. Op. at 1 (3d Cir. Dec. 17, 2018) (denying petition for mandamus); Petition for a Writ of Certiorari, Clause v. U.S. Dist. Ct., 137 S. Ct. 825 (2017) (mem.) (No. 16-641), 2016 WL 6696021 [hereinafter Clause Petition for Writ of Certiorari] (referencing Sept. 27, 2016, decision by the Eighth Circuit denying petition for writ of mandamus from lower court decision enforcing venue clause).

17.   *See, e.g.*, Rogal v. Skilstaf, Inc., 446 F. Supp. 2d 334, 338 (E.D. Pa. 2006); Bernikow v. Xerox Corp. Long-Term Disability Income Plan, No. CV-06-2612 RGKSHX, 2006 WL 2536590, at *2 (C.D. Cal. Aug. 29, 2006); Schoemann *ex rel.* Schoemann v. Excellus Health Plan, Inc., 447 F. Supp. 2d 1000, 1007 (D. Minn. 2006); Wellmark, Inc. v. Deguara, No. 4:02-CV-40534, 2003 WL 21254637, at *1 (S.D. Iowa May 28, 2003).

hindered employees'[18] enforcement of their rights.[19]   During the last four terms, the intersection of forum selection clauses and ERISA triggered four separate petitions for certiorari to the Supreme Court.[20] While the Court denied each appeal,[21] the split in the lower courts invites resolution by the highest court.

On both sides of the divide, in-depth statutory interpretation is a rarity.[22] Further, no scholarship to date has wrestled with this interpretative imbroglio.[23]   Such analysis is critical because forum selection clauses that conflict with public policy are unenforceable.[24]   Our Article fills this gap. Relying on bills, reports, and the conduct of key actors in pension reform, it deciphers ERISA's public policy of providing "ready access to the Federal courts."[25] With this interpretative compass, we explain why most courts have missed the mark.

---

18.   ERISA refers to "participants and beneficiaries."  For sake of economy, we generally refer to "employees" or "plaintiffs."

19.   29 U.S.C. § 1132(e)(2) (2012) (listing venue options); *infra* Part II.A and accompanying text; *see, e.g.*, Dumont v. Pepsi, Co., Inc. 192 F. Supp. 3d 209, 219 (D. Me. 2016); Nicolas v. MCI Health & Welfare Plan No. 501, 453 F. Supp.2d 972, 974 (E.D. Tex.2006).

20.   Petition for a Writ of Certiorari, Robertson v. U.S. Dist. Ct., – S. Ct. – (No. 18-609), 2019 WL 1874230 (2019); Petition for a Writ of Certiorari, Mathias v. U.S. Dist. Ct., 138 S. Ct. 756 (2018) (mem.) (No. 17-740), 2017 WL 5564204; Clause Petition for Writ of Certiorari, *supra* note 16; Petition for a Writ of Certiorari, Smith v. Aegon Cos. Pension Plan, 136 S. Ct. 791 (2016) (mem.) (No. 14-1168), 2015 WL 1322266.

21.   Mathias v. U.S. Dist. Ct., 138 S. Ct. 756, 756 (2018) (mem.), *cert. denied*; Clause v. U.S. Dist. Ct., 137 S. Ct. 825 (2017) (mem.), *cert. denied*; *Smith*, 136 S. Ct. at 791.

22.   *See, e.g.*, Testa v. Becker, No. CV 10-638-GHK (FMOx), 2010 WL 1644883, at *5 (C.D. Cal. Apr. 22, 2010) (enforcing a forum selection clause without engaging in a thorough statutory interpretation of ERISA); Laasko v. Xerox Corp., 566 F. Supp. 2d 1018, 1023 (C.D. Cal. 2008); Klotz v. Xerox Corp., 519 F. Supp. 2d 430, 436 (S.D.N.Y. 2007); Bernikow v. Xerox Corp. Long-Term Disability Income Plan, No. CV 06-2612 RGKSHX, 2006 WL 2536590, at *2 (C.D. Cal. Aug. 29, 2006); *Wellmark*, 2003 WL 21254637, at *4; *Rogal*, 446 F. Supp. 2d at 338.

23.   Articles to date focus more on reporting what courts and plans have done rather than engaging with statutory interpretation.   *See, e.g.*, Barry L. Salkin, *Forum Selection Provisions in ERISA Plans*, 29 BENEFITS L.J. 1 (2016); Kathryn J. Kennedy, *Protective Plan Provisions for Employer-Sponsored Employee Benefit Plans*, 18 MARQ. BENEFITS & SOC. WELFARE L. REV. 1, 58-60 (2016); Pratt, *supra* note 9, at 24.   *But see* Michelle Streifthau-Livizos, *Protecting the Loyal Hardworker: The Need for a Fair Analysis of Venue Clauses in ERISA Plans*, available at https://www.laborandemploymentcollege.org/images/pdfs/October2017newsletter/Venue-Clauses-in-ERISA-Plans.pdf [https://perma.cc/275H-BMCF] (addressing the merits of such clauses).

24.   *See* M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972) ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." (citing Boyd v. Grand Trunk W. R. Co., 338 U.S. 263 (1949))); *accord Boyd*, 338 U.S. at 265.

25.   29 U.S.C. § 1001(b) (2012).

The Article unfolds as follows. Part I provides necessary background on venue, including the evolution of jurisprudence enforcing forum selection clauses and an overview of the case law involving claims under ERISA. Part II provides the analytical heavy lifting. It begins with a thorough synthesis of the legislative history of ERISA. This history explains Congress's goals during its pension reform effort. The Article then provides evidence about the historical context for ERISA, explaining why, given the state of the law at the Act's passage, all interested players understood a statutory venue would control. Part III completes the analysis, bridging this legislative intent and a close reading of the statutory language. These various sources show the current trend toward enforcement of ERISA forum selection clauses is wrong.

## I.    VENUE BASICS

As any first-year law student can recite, a plaintiff may only pursue litigation in a court with subject matter jurisdiction;[26] with personal jurisdiction over the person(s) or property involved;[27] and in a permissible venue.[28] Whereas subject matter and personal jurisdiction are constitutional requirements,[29] venue is governed by statutory and decisional law. For federal actions, 28 U.S.C. section 1391 provides the general venue rules,[30] though

---

26.    *See, e.g.*, Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701–02 (1982) ("Federal courts are courts of limited jurisdiction. The character of the controversies over which federal judicial authority may extend are delineated in Art. III, § 2, cl. 1. Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction. Again, this reflects the constitutional source of federal judicial power: Apart from this Court, that power only exists 'in such inferior Courts as the Congress may from time to time ordain and establish.'" (citing Art. III, § 1)); *see also* 28 U.S.C. §§ 1331, 1332 (2012) (providing for federal question and diversity subject matter jurisdiction).

27.    *See, e.g.*, J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 880 (2011) ("A court may subject a defendant to judgment only when the defendant has sufficient contacts with the sovereign 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" (quoting Int'l Shoe Co. v. Wash., 326 U.S. 310, 316 (1945))); *see also* FED. R. CIV. P. 4(k)(1)(a) (stating that service of process establishes personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located").

28.    *See* 28 U.S.C. § 1390 (2012) (establishing venue as "the geographic specification of the proper court").

29.    *See* U.S. CONST. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .").

30.    28 U.S.C. § 1391 provides three options in descending order of priority. First, venue is appropriate in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located . . . ." 28 U.S.C. § 1391(b)(1) (2012). If there are multiple defendants residing in different districts, the next preferred venue is "a judicial district in which a substantial part of the events or omissions giving rise to the

many federal regulatory statutes, ERISA among them,[31] include specialized provisions that override or supplement the venues section 1391 identifies.[32]

A defendant has a variety of options for contesting venue. If a plaintiff files suit in an improper venue, the defendant may file a motion to dismiss under Federal Rule of Civil Procedure 12(b)(3)[33] or under 28 U.S.C. section 1406.[34] If a plaintiff sues in a statutorily proper but otherwise inconvenient venue, a defendant may seek a transfer under 28 U.S.C. section 1404.[35] This Part focuses on a third option for challenging venue: a motion seeking dismissal or transfer of a lawsuit on the basis of a forum selection clause. Increasingly, putative parties are bound by forum selection clauses that identify specific fora for litigation.[36] Part I.A explains why, when, and how forum selection clauses alter judicial analysis of venue. Part I.B then describes

---

claim occurred, or a substantial part of property that is the subject of the action is situated . . . ." 28 U.S.C. § 1391(b)(2) (2012). If no such district exists, then venue is appropriate in any district having personal jurisdiction over any defendant. 28 U.S.C. § 1391(b)(3) (2012).

31.  29 U.S.C. § 1132(e)(2) (2012).

32.  *See, e.g.*, 28 U.S.C. § 1394 (2012) (laying venue "in the judicial district where such [defendant national banking] association is located"); 28 U.S.C. § 1396 (2012) (laying venue "in the district where the liability for such tax accrues, in the district of the taxpayer's residence, or in the district where the return was filed"); 28 U.S.C. § 1397 (2012) (authorizing venue for interpleader actions in the district "in which one or more of the claimants reside"); 28 U.S.C. § 1398 (2012) (limiting venue for challenging certain Interstate Commerce Orders to "a judicial district in which any one of the parties bringing the action resides or has its principal office"); 28 U.S.C. § 1400(b) (2012) (laying venue "where the defendant resides, or where the defendant has committed acts of [patent] infringement and has a regular and established place of business").

33.  FED. R. CIV. P. § 12(b)(3) (improper venue).

34.  28 U.S.C. § 1406 (2012) (cure or waiver of defects).

35.  28 U.S.C. § 1404 (2012) (change of venue).

36.  *See, e.g.*, Dumont v. Pepsico, Inc., 192 F. Supp. 3d 209, 211 (D. Me. 2016) (discussing forum selection clause limiting venue to Southern District of New York); Harris v. BP Corp. N. Am., No. 15 C 10299, 2016 WL 8193539, at *2 (N.D. Ill. July 8, 2016) (discussing forum selection clause limiting venue to Harris County, Texas); Feather v. SSM Health Care, 216 F. Supp. 3d 934, 937 (S.D. Ill. 2016) (limiting venue to Eastern District of Missouri); *see also* Kevin M. Clermont, *Governing Law on Forum-Selection Agreements*, 66 Hastings L.J. 643, 645–46 (2015) ("Good lawyers increasingly try to contract their clients' way around the morass of the law on authority to adjudicate, and to do so in a way that advantages their clients."); John McKinley Kirby, *Consumer's Right to Sue at Home Jeopardized Through Forum Selection Clause in* Carnival Cruise Lines v. Shute, 70 N.C. L. Rev. 888, 888 (1992) ("During this century American courts increasingly have enforced forum selection clauses in contracts."); Matthew J. Sorensen, *Enforcement of Forum-Selection Clauses in Federal Court After Atlantic Marine*, 82 Fordham L. Rev. 2521, 2528 (2014) ("Forum-selection clauses have permeated American commercial activity to such an extent that even many of today's form contracts designate the appropriate forum to litigate disputes.").

ERISA's special statutory venue provision, and the current judicial split over the enforceability of such clauses.

## A.   Venue Rules and Forum Selection Clauses

Through the first six decades of the twentieth century, courts in the United States were generally skeptical of or even hostile to forum selection clauses.[37]  In the words of the Restatement of Contracts:

> A bargain to forego a privilege, that otherwise would exist, to litigate in a Federal Court rather than in a State Court, or in a State Court rather than in a Federal Court, or otherwise to limit unreasonably the tribunal to which resort may be had for the enforcement of a possible future right of action . . . , is illegal.[38]

Nonetheless, an undercurrent of support for enforcement of forum selection clauses existed in some contexts.[39]  This support viewed a court's failure to

---

37.   M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9 (1972) ("Forum-selection clauses have historically not been favored by American courts."); *see also, e.g.*, Carbon Black Exp., Inc. v. The Monrosa, 254 F.2d 297, 300–01 (5th Cir. 1958) (discussing "the universally accepted rule that agreements in advance of controversy whose object is to oust the jurisdiction of the courts are contrary to public policy and will not be enforced" (footnote omitted)); Nat'l Equip. Rental, Ltd. v. Sanders, 271 F. Supp. 756, 761 (E.D.N.Y. 1967) (stating that "a contractual commitment to an alien court, although of a civilized country, may be of doubtful validity"); Murillo Ltda. v. The Bio Bio, 127 F. Supp. 13, 14 (S.D.N.Y. 1955) ("To say that the effect to be given to [forum selection clause] is controversial would be more than mild understatement."), *aff'd per curiam*, 227 F.2d 519 (2d Cir. 1955).

38.   Restatement (First ) of Contracts § 558 (Am. Law Inst. 1932).

39.   For example, the Restatement of Conflict of Laws appears not to have taken as strict a view as the Restatement of Contracts.  *Compare* Restatement (First) of Contracts § 558 (Am. Law Inst. 1932), *with* Restatement (First) of Conflicts of Laws § 617 (Am. Law Inst. 1934) ("Parties to a contract may provide that all actions for breach of the contract shall be brought only in a certain court, and the courts of other states will usually give effect to such a provision; but the requirement can be imposed only by consent of the parties and as a term of the contract.  If the parties agree, it is not like the case of one state prescribing by its statute what the courts of another state may do."); *accord* Michael Gruson, *Forum-Selection Clauses in International and Interstate Commercial Agreements*, 1982 U. Ill. L. Rev. 133, 145 n.41 (1982) (noting that section 558 of the Restatement of Contracts "is much more restrictive" than Comment *a* to section 617 of the Restatement of Conflict of Laws); *see also* Krenger v. Penn. R. Co., 174 F.2d 556, 561 (2nd Cir. 1949) (Learned Hand, J., concurring) ("In truth, I do not believe that, today at least, there is an absolute taboo against such contracts at all; in the words of the Restatement [of Contracts, § 558], they are invalid only when unreasonable." (footnote omitted)).

enforce a forum selection clause as endorsing both forum shopping and "welch[ing]" on contractual obligations.[40]

The Supreme Court's June 1972 decision in *M/S Bremen* v. *Zapata Off-Shore Co.*[41] signaled a shift in attitude toward forum selection clauses.[42] *The Bremen* involved two sophisticated parties with relatively equal bargaining power in what was anything but a run-of-the-mill deal.[43] A Houston, Texas drilling company contracted a German firm to tow a six-million-dollar drilling rig from Louisiana to the Adriatic.[44] The governing contract included a forum selection clause, which "figur[ed] prominently" in the parties' negotiations because their novel, risky transaction would "traverse the waters of many jurisdictions."[45] Invoking "present-day commercial realities and expanding international trade," the Court held the clause controlling "absent a strong showing that it should be set aside."[46] A plaintiff could make such a showing with evidence that the clause: (1) contravened public policy;[47] (2) was

---

40.  *In re* Unterweser Reederei, GmB.H., 446 F.2d 907, 909 (5th Cir. 1971) (Wisdom, J., dissenting) ("In these circumstances Zapata, represented by experienced counsel, should not be allowed to welch on its bargain."), *vacated sub nom.* M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972); *see also* Atl. Marine Constr. Co. v. U.S. Dist. Ct., 571 U.S. 49, 64 (2013); *accord* Kurt H. Nadelmann, *Comment, Choice-of-Court Clauses in the United States: The Road to* Zapata, 21 AM. J. COMP. L. 124, 133–34 (1973) (discussing how the facts of *The Bremen* "rais[ed] questions of commercial honesty," making *The Bremen* "a so-called easy case").

41.  407 U.S. 1 (1972).

42.  *See* Michael D. Moberly, *Judicial Protection of Forum Selection: Enforcing Private Agreements to Litigate in State Court*, 1 PHOENIX L. REV. 1, 10 (2008) ("Judicial dissatisfaction with the ouster principle ultimately culminated in the Supreme Court's decision in *M/S Bremen v. Zapata Off-Shore Co. . . . .*" (footnote omitted)).

43.  *See Bremen*, 407 U.S. at 12 ("The choice of that forum was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts.").

44.  *In re* Unterweser Reederei, GMBH, 428 F.2d 888, 896 (5th Cir. 1970) (Wisdom, J., dissenting), *on reh'g en banc sub nom. In re* Unterweser Reederei, GMBH, 446 F.2d 907 (5th Cir. 1971), *vacated sub nom.* M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972).

45.  *Bremen*, 407 U.S. at 13–14 ("There is strong evidence that the forum clause was a vital part of the agreement, and it would be unrealistic to think that the parties did not conduct their negotiations, including fixing the monetary terms, with the consequences of the forum clause figuring prominently in their calculations." (footnote omitted)).

46.  *Id.* at 15.

47.  *Id.* at 10 n.11, 15 (citing case law refusing to enforce forum selection clauses conflicting with a statutory-based public policy); *see also* Mullenix, *supra* note 14, at 356 n.351 ("The Court also noted that *Muller* was overruled in Indussa Corp. v. S.S. Rangborg, 377 F.2 200, 203-04 (2d Cir. 1967), as in conflict with COGSA, thereby anticipating *The Bremen's* 'public policy' exception.").

unreasonable or unjust, and thus unenforceable; or (3) was unenforceable because it was a product of fraud or overreaching.[48]

The potential impact of *The Bremen*, however, remained uncertain for almost two decades.[49] Much of the decision's reasoning focused on the historical use of forum selection clauses in admiralty cases and the sophistication of the two parties.[50] Whether the Court would expand this line of reasoning to general commercial contracts, let alone to contracts between businesses and consumers, remained an open question.[51]

In 1988, the Court limited *The Bremen* in *Stewart v. Ricoh*,[52] when it declined to uphold a forum selection clause in an agreement between a dealer and a copier manufacturer.[53] The Eleventh Circuit Court of Appeals held the clause enforceable as a matter of law under *The Bremen*.[54] Rather than focusing solely on the existence of a venue clause, the Supreme Court instead instructed lower courts to consider such clauses as part of a broader section 1404 analysis. The Court explained, "[a]lthough we agree with the Court of Appeals that the *Bremen* case may prove 'instructive' in resolving the parties' dispute, . . . we disagree with the court's articulation of the relevant inquiry as 'whether the forum selection clause in this case is unenforceable under the standards set forth in *The Bremen*.'"[55]

It was not until *Carnival Cruise Lines, Inc. v. Shute*[56]—decided seventeen years after ERISA's enactment—that the Court addressed a contract not involving sophisticated businesspeople but a company and individual

---

48. Mullenix, *supra* note 14, at 318, 355–56. ("[T]hat enforcement would be unreasonable or unjust," "that the clause was invalid for such reasons as fraud or overreaching," or that "enforcement would contravene a strong public policy of the forum in which the suit is brought . . . ."); *see also* Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595 (1991); Haughton v. Plan Adm'r of Xerox Corp. Ret. Income Guarantee Plan, 2 F. Supp. 3d 928, 933 (W.D. La. 2014).

49. *See, e.g.*, Nadelmann, *supra* note 40, at 124 (describing the opinion "as a decision of unusual importance to international trade" rather than to forum selection). In part, this confusion stems from the limited scope of the decision. *See* David H. Taylor, *The Forum Selection Clause: A Tale of Two Concepts*, 66 Temp. L. Rev. 785, 815 n.167 (1993) ("There is no discussion in the Court's opinion of a forum selection clause contained in a purely domestic contract specifying a domestic forum.").

50. *Bremen*, 407 U.S. at 10, 13-14.

51. *See, e.g.*, Nadelmann, *supra* note 40, at 134–35 (characterizing *The Bremen* as "control[ing] the field of admiralty . . . [but i]n the area of general commercial law where state law has control the decision . . . is not of direct assistance" (footnote omitted)).

52. 487 U.S. 22 (1988).

53. *Id.* at 28–29.

54. Stewart Org., Inc. v. Ricoh Corp., 810 F.2d 1066, 1071 (11th Cir. 1977) (subsequent history omitted).

55. *Stewart*, 487 U.S. at 28.

56. 499 U.S. 585 (1991).

consumers.  There, the Court moved away from its more reserved holding in *The Bremen*, and certainly further away from its holistic approach in *Stewart*.[57]  In *Carnival Cruise*, the Court enforced a forum selection clause found in "a passage contract [that] was purely routine and doubtless nearly identical to every commercial passage contract."[58]  In doing so, the Court expanded the enforceability of such clauses not only to consumer contracts,[59] but more generally to contracts of adhesion[60] and those between parties with unequal bargaining power.[61]  Even as it did so, however, the Court retained *The Bremen*'s proviso that conflicting public policy could invalidate a forum selection clause.[62]

The Court most recently addressed forum selection clauses in 2013 in *Atlantic Marine Construction Co., Inc. v. District Court*.[63]  While *The Bremen* and *Carnival Cruise* focus on the scope of enforcement for forum selection clauses, *Atlantic Marine* focuses on the mechanics.  In *Atlantic Marine*, the Court held a plaintiff who complies with the relevant federal statutory venue provision has sued in the correct court—even if that court conflicts with a

---

57.  *See* Edward P. Gilbert, *We're All in the Same Boat*: Carnival Cruise Lines, Inc. v. Shute, 18 BROOK. J. INT'L L. 597, 604–05 (1992) ("Since *The Bremen*, the Supreme Court has supported the use of forum selection clauses in contracts between sophisticated businesspersons and has held these clauses to be *prima facie* valid.  Nonetheless, the Court has also displayed hesitation in enforcing such clauses if a party can show that enforcement would be unreasonable, against public policy, or if the parties who sued would be deprived of their day in court because the contractual forum would be gravely inconvenient.").  This broadening of *The Bremen* drew criticism from Justices Stevens and Marshall.  *Carnival Cruise Lines*, 499 U.S. at 601–02 (1991) (Stevens & Marshall, J. dissenting) ("*The Bremen*, which the Court effectively treats as controlling this case, had nothing to say about stipulations printed on the back of passenger tickets.  That case involved the enforceability of a forum-selection clause in a freely negotiated international agreement between two large corporations providing for the towage of a vessel from the Gulf of Mexico to the Adriatic Sea.  The Court recognized that such towage agreements had generally been held unenforceable in American courts, but held that the doctrine of those cases did not extend to commercial arrangements between parties with equal bargaining power.").

58.  *Id.* (citations omitted).

59.  *Carnival Cruise*, 499 U.S. at 595.

60.  As the Court explained, given the economic realities of this sort of transaction, "[c]ommon sense dictate[d]" that the Shutes' ticket would "be a form contract the terms of which [we]re not subject to negotiation, and that an individual purchasing the ticket [would] not have bargaining parity with the cruise line."  *Id.*; *see also* Kirby, *supra* note 14, at 894–901 (discussing the evolution of judicial treatment of forum selection clauses).

61.  *Carnival Cruise*, 499 U.S. at 593 ("As an initial matter, we do not adopt the Court of Appeals' determination that a nonnegotiated forum-selection clause in a form ticket contract is never enforceable simply because it is not the subject of bargaining.").

62.  *Id.* at 595–97 (analyzing alleged conflict between forum selection clause and statutory provision governing vessel owners' contracts with passengers).

63.  571 U.S. 49 (2013).

forum selection clause.[64]    Thus, section 1404, not 1406, is the proper procedural mechanism to enforce a valid forum selection clause.[65]    Since venue was technically proper, the defendant could not enforce the clause via a motion to dismiss under Rule 12(b)(3) or 28 U.S.C. section 1406.[66]    From there, the Court addressed how a forum selection clause alters the analysis for a section 1404(a) motion to transfer.[67]    Specifically, when the lawsuit involves a valid forum selection clause a court affords "the plaintiff's choice of forum . . . no weight."[68]    In this morass of procedural technicality, the Court effectively generalized *The Bremen* principles to all contracts.[69]

---

64.    *See id.* at 56 ("The structure of the federal venue provisions confirms that they alone define whether venue exists in a given forum.").

65.    *Id.* at 59 ("Although a forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of § 1406(a) . . . the clause may be enforced through a motion to transfer under § 1404(a)."); *see also id.* at 61 (in which the Court declined to apply its holding to Rule 12(b)(6) motions).  This finding builds on the Court's prior discussion of the scope of section 1404 in *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) ("Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer [involving forum selection clauses] according to an 'individualized, case-by-case consideration of convenience and fairness.'" (citation omitted)).

66.    *Atl. Marine*, 571 U.S. at 56 ("[A] case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3).").  Before *Atlantic Marine* settled the issue, the federal statutes governing venue and the Federal Rules of Civil Procedure appeared to give defendants two seeming statutory alternatives: sections 1404 and 1406 to enforce a forum selection clause.  *Compare* 28 U.S.C. § 1404 (2012) (authorizing transfer "[f]or the convenience of parties . . . , in the interest of justice" to "transfer any civil action to any other district or division where [the action] might have been brought or . . . to which all parties have consented"), *with* 28 U.S.C. § 1406 (2012) (authorizing a district court to dismiss the case, "or, if it be in the interest of justice, [to] transfer [the] case to any district or division in which [the case] could have been brought").  The Federal Rules of Civil Procedure also provided two additional options: Rule 12(b)(3) and Rule 12(b)(6).  *Compare* FED. R. CIV. P. 12(b)(3) (authorizing dismissal for improper venue), *with* FED. R. CIV. P. 12(b)(6) (authorizing dismissal for "failure to state a claim upon which relief can be granted").

67.    *Atl. Marine*, 571 U.S. at 59 ("Section 1404(a) . . . provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district.").

68.    *Id.* at 63.  Thus, whereas *Carnival Cruise* limited potential unenforceability challenges, *Atlantic Marine* narrowed potential factors for transfer of an otherwise valid, enforceable clause.  In the absence of a forum selection clause, a district "must evaluate both the convenience of the parties and various public-interest considerations," *Id.* at 62 (footnote omitted), and "also give some weight to the plaintiffs' choice of forum." *Id.* at 62 n. 6 (footnote omitted) (listing public and private-interest factors).  With a forum selection clause, however, the Court held "the private-interest factors to weigh entirely in favor of the preselected forum." *Id.* at 64.  This would leave only the public-interest factors to consider, and they "will rarely defeat a transfer motion . . . ." *Id.*; *see also id.* at 52 (holding a court "should transfer the case unless extraordinary circumstances unrelated to the convenience of the parties clearly disfavor a transfer").

69.    *Id.* at 62.

Together, these cases provide a roadmap for challenging forum selection clauses.[70] First, the plaintiff can show a forum selection clause is invalid. This requires an analysis of whether the clause violates public policy, including policy embodied in a federal venue statute.[71] Second, a plaintiff can contest enforceability by showing the clause was the product of fraud, overreaching, or lack of notice.[72] Third, a plaintiff can argue a court should override a valid, enforceable forum selection clause when transfer would contravene what courts call "public factors."[73] It is only in the "extraordinary" case, however, that these factors will overcome enforcement.[74]

Even with this guidance, many questions remain. The Court's holding in *Atlantic Marine* applies only if there is "a contractually valid forum-selection clause."[75] As Professor Stephen Sachs has observed, this decision "places enormous weight on whether a forum-selection clause is valid and enforceable. . . . Yet the opinion says nothing about which clauses are valid in the first place."[76] Moreover, *Atlantic Marine* does not address how a special statutory venue provision, such as the one in ERISA, affects a forum selection clause. The Supreme Court's most recent decision on the subject, *Boyd v. Grand Trunk Western Railroad Company*,[77] was issued seventy years ago.[78] In *Boyd*, the Court held a forum selection clause void when the clause conflicted

---

70. *Id.*; Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585 (1991); M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972).

71. *See Bremen*, 407 U.S. at 15 (citing Boyd v. Grand Trunk W. R. Co., 338 U.S. 263 (1949)).

72. *See Carnival Cruise*, 499 U.S. at 595. Drawing a meaningful distinction between validity and enforceability is vital to principled analysis. Validity addresses whether a forum selection clause is ever possible for a particular substantive claim. If invalid, the clause can never apply to the cause of action. Enforcement considers whether an otherwise valid clause may not apply to a particular transaction or relationship. By collapsing validity and enforcement, courts risk allowing forum selection clauses to bind parties in the absence of fraud or duress without first fully ensuring the clause is valid under public policy.

73. *Atl. Marine*, 571 U.S. at 62 n.6. Though not an exhaustive list, public factors courts consider include: "(1) the administrative difficulties flowing from court congestion; (2) the interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or the application of foreign law." *E.g., In re* Volkswagen of Am., Inc., 545 F.3d 304, 315 (5th Cir. 2008).

74. *Atl. Marine*, 571 U.S. at 64.

75. *Id.* at 62 n.5 ("Our analysis presupposes a contractually valid forum-selection clause.").

76. Stephen E. Sachs, *Five Questions after* Atlantic Marine, 66 HASTINGS L.J. 761, 766 (2015); *see also* Adam N. Steinman, Atlantic Marine *Through the Lens of* Erie, 66 HASTINGS L.J. 795, 800 (2015) ("[T]he *Atlantic Marine* opinion itself places no restrictions on a court's assessment of contractual validity in the first instance.").

77. 338 U.S. 263 (1949).

78. *Id.*

with a statutorily declared policy.[79]  Some courts question whether subsequent judicial decisions undermine *Boyd*.[80]  Consequently, whether parties can use a forum selection clause to override a special statutory venue provision remains hotly debated.[81]

## B.    Forum Selection Clauses and ERISA

Given the trend toward enforcement, it is not surprising ERISA plans are increasingly employing forum selection clauses.[82]  These clauses generally designate a single locale from the multiple options authorized by ERISA's venue provision.[83]  This provision, Section 502(e)(2) of ERISA, codified at 29 U.S.C. section 1132(e)(2), provides:

> Where an action under [Title I of ERISA] is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.[84]

While lower courts are generating a growing body of jurisprudence on ERISA forum selection clauses, decisions on both sides focus primarily on the second or third steps in evaluating forum selection clauses, namely enforceability or

---

79.   *Id.* at 266.

80.   *See In re* Mathias, 867 F.3d 727, 733 (7th Cir. 2017) (characterizing *Boyd* as "a bit of a relic" from "an era of marked judicial suspicion of contractual forum selection"); Turner v. Sedgwick Claims Mgmt. Servs., Inc., No. 7:14-CV-1244-LSC, 2015 WL 225495, at *11–14 (N.D. Ala. Jan. 16, 2015).

81.   *Compare, e.g.*, Nicolas v. MCI Health & Welfare Plan No. 501, 453 F. Supp. 2d 972, 974 (E.D. Tex. 2006) ("[T]he policies of the ERISA statutory framework supercede [sic] the general policy of enforcing forum selection clauses."), *with* Williams v. CIGNA Corp., No. 5:10-CV-00155, 2010 WL 5147257, at *4 (W.D. Ky. Dec. 13 2010) ("[F]orum selection clauses are enforceable in ERISA plans."); Rodriguez v. PepsiCo Long Term Disability Plan, 716 F. Supp. 2d 855, 860–61 (N.D. Cal. 2010) (holding forum selection clauses are not inconsistent with ERISA's venue provision).

82.   *See, e.g.*, *It's Never Too Late for a Forum Selection Clause—Court Enforces Clause Added After the Plaintiff Retired*, Littler: ASAP (Feb. 19, 2013), https://www.littler.com/ publication-press/publication/its-never-too-late-forum-selection-clause-%E2%80%93-court-enforces-clause [https://perma.cc/T8WQ-CQ2F] (discussing the increased use of such clauses in pension plans); Pension Rights Center Amicus Brief, *supra* note 9, at 2 ("[V]enue clauses are being adopted with increasing frequency . . . .").

83.   *See, e.g.*, Harris v. BP Corp. N. Am., No. 15 C 10299, 2016 WL 8193539, at *4 (N.D. Ill. July 8, 2016); Loeffelholz v. Ascension Health, Inc., 34 F. Supp. 3d 1187, 1191 (M.D. Fla. 2014); Mroch v. Sedgwick Claims Mgmt. Servs., Inc., No. 14-CV-4087, 2014 WL 7005003, at *2 (N.D. Ill. Dec. 10, 2014).

84.   29 U.S.C. § 1132(e)(2) (2012).

the public interest factors.[85] Decisions enforcing such clauses acknowledge employees' lack of bargaining power.[86] For example, the District Court in Minnesota upheld such a clause, after noting the plaintiff was not involved in negotiating the clause and likely did not know it existed.[87] These decisions often analogize enforcing such clauses to upholding contractual arbitration provisions.[88] As for public interest factor challenges, courts usually find insufficient reason to overcome the presumption that forum selection clauses control.[89] Some decisions even approve of clauses requiring suit in a court not described in section 1132(e)(2).[90]

---

85. *Compare, e.g.*, Feather v. SSM Health Care, 216 F. Supp. 3d 934, 943 (S.D. Ill. 2016) (finding public interest factors do not override the forum selection), *with, e.g.*, Coleman v. Supervalu, Inc., Short Term Disability Program, 920 F. Supp. 2d 901, 908 (N.D. Ill. 2013) (concluding forum selection clause was unenforceable, in part because "ERISA plans are rarely the subject of arms'-length negotiation").

86. *See, e.g., In re* Mathias, 867 F.3d 727, 731 (7th Cir. 2017) (finding "contractual forum-selection clauses are presumptively valid even in the absence of arm's-length bargaining") (citation omitted); *Loeffelholz*, 34 F. Supp. 3d at 1191 (upholding forum selection clause even though "employees do not participate in the negotiation process by design"); Angel Jet Servs. v. Red Dot Bldg. Sys.' Emp. Benefit Plan, No. CV-09-2123-PHX-GMS, 2010 WL 481420, at *2 (D. Ariz. Feb. 8, 2010) (upholding forum selection clause so long as the employer, not the participant, had notice of the clause); Laasko v. Xerox Corp., 566 F. Supp. 2d 1018, 1024 (C.D. Cal. 2008) (explaining plaintiff "was not given notice of the forum provision in advance.").

87. Schoemann *ex rel.* Schoemann v. Excellus Health Plan, Inc., 447 F. Supp. 2d 1000, 1007 (D. Minn. 2006) ("[W]hen, as here, the contract [containing the clause] was negotiated between a plan administrator and an employer, the forum-selection clause obviously does not reflect any 'preference' of the beneficiaries. Indeed, it is likely that a typical beneficiary does not even know that the forum-selection clause exists."); *see also Mathias*, 867 F.3d at 736 (Ripple, J., dissenting) ("An ERISA beneficiary has *no* role in the negotiation or even the acceptance of the plan terms."); Mozingo v. Trend Pers. Servs., No. 10-4149-JTM, 2011 WL 3794263, at *6 (D. Kan. Aug. 25, 2011), *aff'd*, 504 F. App'x 753 (10th Cir. 2012) (pointing out that plaintiff was not a signatory to the plan document containing a forum selection clause); Conte v. Ascension Health, No. 11-12074, 2011 WL 4506623, at *2 (E.D. Mich. Sept. 28, 2011) (upholding forum selection clause even though "Plaintiff did not have bargaining power to negotiate the inclusion or exclusion of the forum selection clause . . . .").

88. *See, e.g.*, Turner v. Sedgwick Claims Mgmt. Servs., Inc., No. 7:14-CV-1244-LSC, 2015 WL 225495, at *14 (N.D. Ala. Jan. 16, 2015); Haughton v. Plan Adm'r of Xerox Corp. Ret. Income Guarantee Plan, 2 F. Supp. 3d 928, 934 (W.D. La. 2014) ("Clearly, if ERISA does not prohibit parties from agreeing to arbitrate statutory ERISA claims outside of a judicial forum, *a fortiori* it does not prohibit parties from agreeing to resolve their dispute before a stipulated judicial forum." (footnote omitted)).

89. *See Mathias*, 867 F.3d at 732; *see also* Clause v. Sedgwick Claims Mgmt. Servs., Inc., No. CIV 15-388-TUC-CKJ, 2016 WL 213008, at *4 (D. Ariz. Jan. 19, 2016); Klotz v. Xerox Corp., 519 F. Supp. 2d 430, 436 (S.D.N.Y. 2007).

90. *See* Robertson v. Pfizer Ret. Comm., No. 18-0246, 2018 WL 3618248, at *6 n.8 (E.D. Pa. July 27, 2018) (granting transfer of the case to the Southern District of New York, even though the defendant did not reside in New York, the breach did not occur there, nor

A few courts, however, have resisted wholesale approval of ERISA forum selection clauses.[91] These courts follow the same analytical cycle as those approving such clauses, focusing primarily on the second and third grounds for challenging the provisions. They distinguish clauses previously upheld by the Supreme Court,[92] move on to a truncated discussion of validity,[93] and then focus on enforceability.[94] These decisions often recognize ERISA plaintiffs have no bargaining power,[95] not merely uneven power.

Yet, a key analytical question has gone underanalyzed. Because ERISA does not address forum selection clauses in so many words, the validity inquiry requires thorough analysis of ERISA's policy, history, and text.[96] Under the first step of analysis, forum selection clauses must be valid,

---

was the plan administered in that venue); *accord* Smith v. Aegon Cos. Pension Plan, 769 F.3d 922, 932 (6th Cir. 2014) (stating in dicta "even if the venue selection clause laid venue outside of the three options provided by § 1132, the venue selection clause would still control.").

91. *See, e.g.*, Dumont v. PepsiCo, Inc., 192 F. Supp. 3d 209, 214 (D. Me. 2016); Coleman v. Supervalu, Inc. Short Term Disability Program, 920 F. Supp. 2d 901, 907–08 (N.D. Ill. 2013).

92. *See, e.g.*, *Dumont*, 192 F. Supp. 3d at 214 ("*Bremen*, *Shute*, and *Atlantic Marine*, all of which focus on an agreement between the parties, do not fit the situation before me.").

93. *See, e.g.*, *id.* at 214-15. These short discussions sometimes consider policies other than the one explicitly declared by ERISA in section 1001. *See Coleman*, 920 F. Supp. 2d at 906–07 (analyzing the policy behind ERISA section 1104 but not section 1001). *But see* Nicolas v. MCI Health & Welfare Plan No. 501, 453 F. Supp. 2d 972, 974 (E.D. Tex. 2006) (analyzing sections 1001 and 1132).

94. *See, e.g.*, *Dumont*, 192 F. Supp. 3d at 214; *Coleman*, 920 F. Supp. 2d at 908.

95. *See, e.g.*, *Dumont*, 192 F. Supp. 3d at 214 ("An important distinction between the controlling forum selection clause cases and this case is that Mr. Dumont never agreed to the forum selection clauses contained in the Plans. As pled, Mr. Dumont did not play a part in the negotiation of the Plans, he did not sign off on the Plans, and he did not agree to the addition of the forum selection clauses in 2010." (footnote omitted)); *Coleman*, 920 F. Supp. 2d at 908 ("Although there may be exceptions, ERISA plans are rarely the subject of arms'-length negotiation.").

96. *See, e.g.*, Abramski v. United States, 537 U.S. 169, 180 (2014) ("[W]e must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'") (citing Maracich v. Spears, 570 U.S. 48, 76 (2013)); *cf.* Stonite Prods. Co. v. Melvin Lloyd Co., 315 U.S. 561, 563 (1942) (stating that venue patent interpretation "can best be determined from an examination of the reasons for [the patent statute's] enactment"); Frederick Schauer, Thinking Like a Lawyer: A New Introduction to Legal Reasoning 162 (2009) ("[S]tatutes are often linguistically unclear, whether intentionally or accidentally, and . . . although there are large debates about where judges should go in such cases, there are no debates about whether judges must go somewhere, for in such cases no amount of staring at the indeterminate language of a vague or ambiguous statute will provide an answer absent some sort of supplementation from elsewhere.").

meaning they cannot conflict with public policy.[97]   The Supreme Court requires courts to analyze each statutory venue provision separately to evaluate its effect.[98]   Most courts slight this step,[99] giving little consideration, let alone weight, to the policy behind ERISA.[100]   Statutory interpretation in these cases is often limited to noting that ERISA lacks an express prohibition against forum selection clauses[101] or a passing acknowledgment that ERISA is a "special kind of contract" subject to a unique statutory scheme.[102]

The few decisions wading into this interpretative thicket have reached contrary conclusions.[103]   Some read section 1132 as "permissive,"[104] not "specifically prohibit[ing]" "private parties from waiving ERISA's venue

---

97.   *See* M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972); *see also* Atl. Marine Constr. Co. v. U.S. Dist. Ct., 571 U.S. 49, 62 (2013) ("When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." (footnote omitted)).

98.   Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co., 529 U.S. 193, 204 (2000) ("[A]nalysis of special venue provisions must be specific to the statute . . . .").

99.   *See, e.g.*, Price v. PBG Hourly Pension Plan, No. 12-15028, 2013 WL 1563573, at *2 (E.D. Mich. Apr. 15, 2013) (spending a fraction of the two page opinion on the validity of the forum selection clause); Testa v. Becker, No. CV 10-638-GHK (FMOx), 2010 WL 1644883, at *5 (C.D. Cal. Apr. 22, 2010) (enforcing a forum selection clause without engaging in a thorough statutory interpretation of ERISA); Laasko v. Xerox Corp., 566 F. Supp. 2d 1018, 1023 (C.D. Cal. 2008); Klotz v. Xerox Corp., 519 F. Supp. 2d 430, 436 (S.D.N.Y. 2007); Bernikow v. Xerox Corp. Long-Term Disability Income Plan, No. CV 06-2612 RGKSHX, 2006 WL 2536590, at *2 (C.D. Cal. Aug. 29, 2006).

100.   *See, e.g.*, Shah v. Wellmark Blue Cross Blue Shield, No. CV 16–2397, 2017 WL 1186341, at *2 (D.N.J. Mar. 30, 2017), *appeal dismissed sub nom.* Shah v. Wellmark Blue Cross & Blue Shield, No. 17–1982, 2017 WL 5157741 (3d Cir. Aug. 23, 2017) (upholding clause without analysis of ERISA's goals); Clause v. Sedgwick Claims Mgmt. Servs., Inc., No. CIV 15-388-TUC-CKJ, 2016 WL 213008, at *4 (D. Ariz. Jan. 19, 2016) (enforcing clause based on uniformity interests rather than analyzing "ready access").

101.   *See, e.g.*, Rodriguez v. PepsiCo Long Term Disability Plan, 716 F. Supp. 2d 855, 861 (N.D. Cal. 2010) ("Congress could have—but has not—expressly barred parties from agreeing to restrict ERISA's venue provisions." (citation omitted)); *see also Klotz*, 519 F. Supp. 2d at 436 ("If Congress had wished to prevent parties from waiving ERISA's venue provision by private agreement, it could have done so through an express provision in the statute."); *Bernikow*, 2006 WL 2536590, at *2 ("Had Congress sought to prevent plaintiffs from waiving the statutory venue provision by private agreement, it could have done so by express provision.   Until the Ninth Circuit or Congress speaks to the contrary, there is little justification to hold against the general presumption in favor of enforcing forum selection clauses." (citation omitted)).

102.   *See, e.g.*, *In re* Mathias, 867 F.3d 727, 731 (7th Cir. 2017).

103.   *Compare, e.g.*, Dumont v. PepsiCo, Inc., 192 F. Supp. 3d 209, 219 (D. Me. 2016) (holding ERISA supersedes employer's forum selection clause), *and* Nicolas v. MCI Health & Welfare Plan No. 501, 453 F. Supp. 2d 972, 974 (E.D. Tex. 2006) (same), *with, e.g.*, Feather v. SSM Health Care, 216 F. Supp. 3d 934, 943 (S.D. Ill. 2016) (enforcing forum selection clause), *and* Haughton v. Plan Adm'r of Xerox Corp. Ret. Income Guar. Plan, 2 F. Supp. 3d 928, 936 (W.D. La. 2014) (enforcing forum selection clause).

104.   Smith v. Aegon Cos. Pension Plan, 769 F.3d 922, 932 (6th Cir. 2014).

provision."[105]  Under this logic, private parties may narrow the options listed in section 1132(e)(2).  Others read the section as Congress's means of comprehensively addressing venue for ERISA claims under Title I.  Thus, a forum-selection clause is void as against public policy if it forecloses the range of options afforded by section 1132(e)(2).[106]

In the midst of this disagreement, appellate review of these decisions is slowly growing.  The Sixth and Seventh Circuits allow forum selection clauses to control in ERISA cases,[107] and in three of its last four terms, the Supreme Court has denied a petition for certiorari challenging the validity of such clauses, suggesting it is only a matter of time before the Supreme Court weighs in.

This Article argues that a close reading of ERISA requires courts to protect employees' potential range of venue options.  It seeks to provide the essential analysis to show how section 1132 makes forum selection clauses void as against public policy.  As the next Part details, section 1001(b) is not the only basis for courts to reject forum selection clauses.  Rather, a close reading of the statute as a whole, given both its legislative history and historical context, supports such a conclusion.

## II.   FORUM SELECTION CLAUSES CONFLICT WITH THE POLICY GOALS OF ERISA

ERISA's legislative history and historical context indicate a clear public policy against forum selection clauses.[108]  These clauses resurrect geographic

---

105. *Id.* at 931 ("[I]f Congress had wanted to prevent private parties from waiving ERISA's venue provision, Congress could have specifically prohibited such action.").

106. *See, e.g.,* Nicolas v. MCI Health & Welfare Plan No. 501, 453 F. Supp. 2d 972, 974 (E.D. Tex. 2006).  The Solicitor General of the United States has made such an argument.  *See* Brief for the United States as Amicus Curiae, Smith v. Aegon Cos. Pension Plan, 769 F.3d 922, 932 (6th Cir. 2014) (No. 14-1168), 2015 WL 7625682, at *11 [hereinafter United States Brief] ("[A] plan term is not consistent with ERISA when it eliminates two of the three places where the Act authorizes claimants to sue.").

107. *See Mathias*, 867 F.3d at 728; *Smith*, 769 F.3d at 931–34. The Eighth and Third Circuits both declined petitions for mandamus in decisions enforcing a forum selection clause but did not issue opinions.  Clause Petition for Writ of Cert; *In re* Jefferson R. Robertson, No. 18-2812, Slip Op. at 1 (3d Cir. Dec. 17, 2018) (denying petition for mandamus).

108. *Cf.* RONALD M. DWORKIN, LAW'S EMPIRE 338–50 (1986) (arguing for statutory interpretation to consider pre- and post-enactment history); HENRY M. HART, JR. & ALBERT M. SACKS, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW 1410–17 (10th ed. 1958); CASS R. SUNSTEIN, AFTER THE RIGHTS REVOLUTION: RECONCEIVING THE REGULATORY STATE 157–59 (1990) (supporting reliance on historical context to interpret contracts); Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947) ("The significance of an enactment, its

obstacles Congress aimed to eliminate.[109]  ERISA's enforcement regime, including the statutory venue clause in section 502(e)(2), reflects Congress's decision to rebalance the interests of potential parties and remove procedural barriers.[110]  Benefit claims litigation, the legislative process, and the prevailing law when Congress passed ERISA, likewise, reflect an understanding that forum selection clauses would not override a special statutory venue provision.[111]  This evidence provides essential guidance for interpreting ERISA.

## A.    Clearing Obstacles to Protect Employees

First, ERISA's legislative history signals a clear intent to provide putative plaintiffs "ready access to the Federal courts."[112]  Pre-ERISA, employees faced substantive and procedural obstacles to recovering benefits.  Lawmakers recognized that without legislative change, "many employees" would not receive the benefits they reasonably expected from their pension plan.[113]  The substantive problems stemmed in part from the tenuousness of the promises some pension plans made.[114]  The major reforms in ERISA—minimum

---

antecedents as well as its later history, its relation to other enactments, all may be relevant to the construction of words for one purpose and in one setting but not for another."); Bradley C. Karkkainen, *"Plain Meaning": Justice Scalia's Jurisprudence of Strict Statutory Construction*, 17 HARV. J.L. & PUB. POL'Y 401, 470 (1994) ("[P]lacing the statute in its appropriate legal and historical contexts is a necessary part of the interpretive enterprise.").

109. *See infra* Part III and accompanying notes.

110. 29 U.S.C. § 1132 (e)(2) (2012).

111. *See infra* II.A–II.B and accompanying notes.

112. 29 U.S.C. § 1001(b) (2012).

113. 29 U.S.C. § 1001(a) (2012) ("[M]any employees with long years of employment are losing anticipated retirement benefits . . . .").

114. One threat was "forfeiture risk."  Some pension plans required employees to complete many years of service before they would receive a "vested" or nonforfeitable right to a pension.  *See, e.g.*, 29 U.S.C. § 1001(a) (2012) ("[M]any employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans . . . .").  For a fuller discussion of forfeiture risk, see JAMES A. WOOTEN, THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974: A POLITICAL HISTORY 54–56, 92–94 (2005) (discussing employees who quit or were laid off before they satisfied the service requirement, thus forfeiting the pension credit they had accrued).  Another threat to employees' interests was "default risk," which arose when an employer did not set aside sufficient assets to pay all of the benefits promised by a pension plan.  *See, e.g.*, 29 U.S.C. § 1001(a) (2012) ("[O]wing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered . . . .").  For a fuller discussion of default risk, see WOOTEN, *supra*, at 57–60 (discussing instances in which employees failed to receive the pension benefits because their employer went out of business or terminated an

vesting standards,[115] minimum funding requirements,[116] a government-run guaranty program,[117] and federal fiduciary standards of conduct[118]—resolved many of these "substantive" risks.

But fragility of substantive rights was not the lone barrier. Rights only matter if they can be enforced.[119] Drafters also sought to clear procedural obstacles that previously "hampered effective enforcement of fiduciary responsibilities under state law or recovery of benefits due to participants."[120] These barriers ranged from participants' lack of basic information about their plan to complex issues of jurisdiction, service, and venue.[121] Frank Cummings, a former Senate staffer and the principal drafter of the first comprehensive pension-reform bill introduced in Congress,[122] described these impediments in testimony to the Senate Finance Committee in June 1973.[123] To start, the employee likely would not know the basic features of the plan. As Cummings put it:

> How many employees know the corporate name of the employer, the exact name, and location of the trust and trustees, the location of the bank holding the money, the name of the insurance company through which the plan is funded, if it is funded that way, the identity and addresses of the unions involved, including the international and local unions and their officers, and those of the

---

underfunded pension plan). A third threat to employees' interests in retirement plans was "agency risk," which arose because the people charged with running a pension or welfare benefit plan might mismanage it. For a fuller discussion of agency risk, see *id.* at 43–47 (discussing instances in which plan officials wasted or misappropriated plan assets).

115. *See* 29 U.S.C. §§ 1051-61 (2012).

116. *See* 29 U.S.C. §§ 1081-85 (2012).

117. *See* 29 U.S.C. §§ 1301-1453 (2012).

118. *See* 29 U.S.C. §§ 1101-14 (2012).

119. *See Second Panel Discussion on Private Pension Plan Reform, Vesting and Funding Provisions; Termination Insurance; Portability; and Fiduciary Standards: Hearing Before the Subcomm. on Private Pension Plans of the S. Comm. on Fin.*, 93d Cong. 107–08 (1973) [hereinafter *Hearing*] (statement of Frank Cummings, attorney, Gall, Lane & Powell); *see also* Kenneth J. Vandevelde, Thinking Like a Lawyer: An Introduction to Legal Reasoning 11 (2d ed. 2011) ("[P]rocedural law shapes substantive law. An ancient maxim of the law holds that 'where there is no remedy, there is no right.' To say that I have a certain right arguably is an insignificant statement unless I can enforce that right in the courts.").

120. S. Rep. No. 93–127, at 35 (1973), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4871.

121. *See generally Hearing*, *supra* note 119, at 106–10 (statement of Frank Cummings, attorney, Gall, Lane & Powell).

122. For Cummings's role, see 113 Cong. Rec. 4650 (Feb. 28, 1967).

123. *Hearing*, *supra* note 119, at 106–10 (statement of Frank Cummings, attorney, Gall, Lane & Powell).

officers who have been designated as trustees? How many employees even know the real name of the plan or the trust or its technical terms?"[124]

Even presuming an employee could obtain this information, he continued, "the legal problems have just begun." [125] Choice of law and jurisdictional barriers added further complications: "Whose law applies? The bank is in one state, the corporation in another state, the employees in several other states, the union in another state, and the contract may not specify a choice of law."[126] And "even if you could decide (probably after costly litigation) which law applies," said Cummings, "what court would have jurisdiction to serve process in all those states, and bring in all the necessary parties? I know of none . . . ."[127]

The text of ERISA memorializes Congress's intent to empower employees to enforce their benefit rights. No challenging deduction is necessary to derive this intent: the "Findings and Declaration of Policy" codified in 29 U.S.C. section 1001 expressly "declar[e]" it to be "the policy" of ERISA "to protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . ."[128] "[P]roviding for . . . ready access to the Federal courts"[129] was one means Congress adopted to this end.

Lawmakers neutralized procedural barriers through a calculated, multipronged approach, ensuring participants and beneficiaries did not just have "access" but "ready access to the Federal courts."[130] The various

---

124. *Id.* at 107–08. ERISA's disclosure requirements, in particular the required contents of the summary plan description that must be provided to plan participants and beneficiaries, address the informational obstacles Cummings describes. *See* 29 U.S.C. § 1022(b) (2012); 29 C.F.R. § 2520.102–3 (2019).

125. *Hearing*, *supra* note 119, at 108 (statement of Frank Cummings, attorney, Gall, Lane & Powell). Cummings was quick to note the questionable nature of such an assumption. See *id.* (stating "you have *no right* to assume in most cases" that employees would have detailed knowledge about their plan) (emphasis in original).

126. *Id.*

127. *Id.*

128. 29 U.S.C. § 1001(b) (2012); *see also* Smith v. Aegon Cos. Pension Plan, 769 F.3d 922, 935 (6th Cir. 2014) (Clay, J., dissenting).

129. 29 U.S.C. § 1001(b) (2012); *Smith*, 769 F.3d at 935.

130. 29 U.S.C. § 1001(b) (2012). The legislative history of what became 29 U.S.C. § 1001(b) demonstrates the importance pension reformers accorded to "ready access to the Federal courts." The "ready access" language in section 1001(b) first appears in the Nixon administration's 1970 fiduciary standards bill and reappears in similar legislation Nixon sent to Congress in 1971 and 1973. S. 3589, 91st Cong. § 2(c) (1970) (revising § 2(b)(2) of the Welfare and Pension Plans Disclosure Act of 1958, as amended); S. 3024, 92d Cong. § 2(c) (1971) (revising § 2(b) of the Welfare and Pension Plans Disclosure Act of 1958, as amended); S. 1557, 93d Cong. § 2(c) (1973) (revising § 2(b) of the Welfare and Pension Plans Disclosure Act of 1958, as amended). The "ready access" language

provisions of section 1132 do much of the work.[131]  Section 1132(a) authorizes causes of action to remedy breaches of ERISA or the terms of a benefit plan, identifying the parties authorized to bring each type of action.[132]  Section 1132(d)(1) allows a plan to sue and be sued as an entity and specifies how a plan may be served.[133]  Section 1132(e)(1) provides for exclusive federal jurisdiction of most actions authorized under section 1132(a) and concurrent jurisdiction for claims enforcing benefit rights under section 1132(a)(1)(B).[134]  Section 1132(f) gives the district courts of the United States "jurisdiction, without respect to amount in controversy or the citizenship of the parties, to grant the relief provided for in [§ 1132(a)] in any action."[135]  Most importantly for this Article, in enacting section 1132(e)(2) Congress intentionally provided liberal venue options that, in the words of an early commentator, authorized plaintiffs under Title I of ERISA to sue "pretty much everywhere."[136]

---

also appears in the "Findings and Declaration of Policy" provision in bills introduced by John Dent, who led pension reform efforts in the House of Representatives; in the pension-reform bill the House Education and Labor Committee reported in October 1973; and in the bill the House passed in February 1974. H.R. 1269, 92d Cong. § 2(b) (1971); H.R. 2, 93d Cong. § 2(b) (as introduced in House, Jan. 3, 1973); H.R. 2 § 2(b) (as reported by H. Comm. on Educ. & Labor, Oct. 2, 1973); H.R. 2 § 2(b) (as passed by House, Feb. 28, 1974).  Bills introduced by Jacob Javits and Harrison Williams, who led pension reform efforts in the Senate, and bills reported by the Senate Labor and Public Welfare Committee included similar "ready access" language in their "Findings and Declaration of Policy."  S. 3598, 92d Cong. § 2(b) (as introduced in Senate, May 11, 1972) (declaring policy "to provide for more appropriate and adequate remedies, sanctions, and ready access to the courts"); S. 3598 § 2(b) (as referred to S. Comm. on Fin., Sept. 19, 1972); S. 4 § 2(b) (as introduced in Senate, Jan. 4, 1973); S. 4 § 2(b) (as reported by S. Comm. on Labor & Pub. Welfare, Apr. 18, 1973).  The Senate pension reform bill did not have a Findings and Declaration of Policy provision, and so did not include the "ready access" language.  See H.R. 2 (as passed by Senate, Mar. 4, 1974).

131.  29 U.S.C. § 1132 (2012); see also Frank Cummings, ERISA Litigation: An Overview of Major Claims and Defenses, 588 A.L.I.-A.B.A. Continuing Legal Educ. Course of Study 517, 521–22 (1991).

132.  29 U.S.C. § 1132(a) (2012).

133.  29 U.S.C. § 1132(d)(1) (2012).

134.  29 U.S.C. § 1132(e)(1) (2012).

135.  29 U.S.C. § 1132(f) (2012).  At the time ERISA was enacted, there was a $10,000 amount-in-controversy requirement for federal-question jurisdiction.  See Act of July 25, 1958, Pub. L. No. 85–554, § 1, 72 Stat. 415.  Congress eliminated this requirement in 1980.  See Act of Dec. 1, 1980, Pub. L. No. 96–486, § 2(a), 94 Stat. 2369.  It is important to note Congress considered many pension reform bills in which employees would have had to satisfy the then-existing amount in controversy requirement.  Section 1132(f) rejected this approach. 29 U.S.C. § 1132(f).

136.  The full quote reads as follows: "For instance, section 502(e)(2) provides that venue in the federal courts can be where the plan is administered, where the breach took place, and where the defendant resides or can be found.  That means pretty much everywhere."  Robert J. Hickey, Liability for Breach of Fiduciary Responsibilities, 31 Bus. Law. 175, 176

Forum selection clauses undermine the policy Congress adopted in ERISA by resurrecting an obstacle the drafters aimed to eliminate. Employees now may live and work in one state but be forced to sue for benefits well over 2000 miles away.[137]   Additionally, employees must possess a degree of precognition to protect their future rights.  By participating in a benefit plan, employees are bound to the plan's selected forum for a potential future suit, without regard to whether they move or retire[138] or their plan later amends the clause to select another forum in a distant locale.[139]   This means an employee may initially accept a job with pension benefits, thinking the benefits are enforceable in one locale.  Should the employee need to sue for such benefits years later, however, that locale may no longer be a viable option for suit.  Instead, the employee may be limited to some far-flung court, in a state in which she never lived or worked.[140]  At the time of filing, putative plaintiffs can no longer rely on the range of venue options drafters consciously added in section 1132.[141]

Rather than squarely addressing Congress's declared policy of expanding "ready access to the Federal courts," decisions enforcing such clauses frequently invoke other policy considerations not declared in the ERISA statute.[142]   These include everything from establishing a uniform

---

(1975); *see also* Richard T. Phillips, *Civil Litigation Under the Employee Retirement Income Security* Act, 49 MISS. L.J. 241, 253 (1978) ("The statutory venue provisions for civil litigation under ERISA are extremely broad.").

137. *See* Marin v. Xerox, 935 F. Supp. 2d 943, 947 (N.D. Cal. 2013) (transfer from Northern District of California to Western District of New York); Testa v. Becker, No. CV 10-638-GHK (FMOx), 2010 WL 1644883, at *7-8 (C.D. Cal. Apr. 22, 2010) (transfer from Central District of California to Western District of New York); Rodriguez v. Pepsico Long Term Disability Plan, 716 F. Supp. 2d 855, 862 (N.D. Cal. 2010) (transfer from Northern District of California to Southern District of New York); Laasko v. Xerox Corp., 566 F. Supp. 2d 1018, 1024 (C.D. Cal. 2008) (transfer from Central District of California to Western District of New York); Bernikow v. Xerox Corp. Long-Term Disability Plan, No. CV 06-2612 RGKSHX, 2006 WL 2536590, at *2 (C.D. Cal. Aug. 29, 2006) (transfer from Central District of California to Western District of New York).

138. *See, e.g., In re* Mathias, 867 F.3d 727, 729, 733–34 (7th Cir. 2017); *Laasko*, 566 F. Supp. 2d at 1020.

139. *See, e.g., Testa*, 2010 WL 1644883, at *2-3 (Apr. 22, 2010); Smith v. Aegon Cos. Pension Plan, 769 F.3d 922, 925-26 (6th Cir. 2014); Dumont v. Pepsico, Inc., 192 F. Supp. 3d 209, 211 (D. Me. 2016).

140. *See, e.g.*, Schoemann *ex rel.* Schoemann v. Excellus Health Plan, Inc., 447 F. Supp. 2d 1000, 1001 (D. Minn. 2006) (transferring case to New York, even though employee worked in Kansas and now lives in Minnesota).

141. *See, e.g.*, Gipson v. Wells Fargo & Co., 563 F. Supp. 2d. 149, 156 (D.D.C. 2008) (acknowledging the District of Columbia, where the plaintiff filed suit, was a proper venue, but transferred the case to Minnesota based on forum selection clause).

142. *See infra* notes 123–125.

administrative scheme[143] to lowering costs of bringing suit[144] to "remov[ing] any uncertainty about where jurisdiction lies, thus avoiding confusion regarding venue selection."[145]

Still other courts rely on policies wholly unconnected with pension reform. These decisions enforce forum selection clauses based on a greater-includes-the-lesser analogy to the policy underlying the Federal Arbitration Act (FAA).[146] After presuming ERISA claims are arbitrable,[147] these courts infer forum selection clauses must be enforceable as well.[148]

Interpretative misdirection of this sort should be rebuffed. While greater-includes-the-lesser reasoning may be appropriate for common law, it is illegitimate under separation of powers principles when a court interprets a statute: the legislature, not the judiciary, made the law the courts are applying. In section 1001 Congress declared "the policy" of ERISA, but declined to declare other policies lawmakers undoubtedly considered. To borrow Chief Justice Burger's words in *The Bremen* decision, section 1001 is "'a strong public policy . . . declared by statute.'"[149] Consequently, courts ought to prioritize the protective policy Congress declared over policies it did not.

"[P]roviding for . . . ready access to the Federal courts" is the fundamental policy courts must consider in enforcing forum selection

---

143. Klotz v. Xerox Corp., 519 F. Supp. 2d 430, 436 (S.D.N.Y. 2007) (stating "[e]nforcement of the forum selection clause . . . . contained in Xerox's LTD [long-term disability] Plan allows one federal court to oversee the administration of the LTD Plan and gain special familiarity with the LTD Plan Document, thereby furthering ERISA's goal of establishing a uniform administrative scheme"); *see also, e.g., Mathias*, 867 F.3d at 733; *Smith*, 769 F.3d at 931–32; Rodriguez v. PepsiCo Long Term Disability Plan, 716 F. Supp. 2d 855, 861 (N.D. Cal. 2010); *Laasko*, 566 F. Supp. 2d at 1023.

144. *See, e.g.* Feather v. SSM Health Care, 216 F. Supp. 3d 934, 941 (S.D. Ill. 2016); Williams v. Ascension Long-Term Disability Plan, No. 16-1361-JTM, 2017 WL 1540635, at *2 (D. Kan, Apr. 28, 2017); Conte v. Ascension Health, No. 11-12074, 2011 WL 4506623, at *4 (E.D. Mich. Sept. 28, 2011); *Schoemann*, 447 F. Supp. 2d at 1007; Scaglione v. Pepsi-Cola Metro. Bottling Co., 884 F. Supp. 2d 642, 643 (N.D. Ohio 2012).

145. *Williams*, 2017 WL 1540635, at *2; *accord* Martinez v. Bloomberg LP, 740 F.3d 211, 219–20 (2d Cir. 2014); Haynsworth v. Corp., 121 F.3d 956, 962 (5th Cir. 1997).

146. Turner v. Sedgwick Claims Mgmt. Servs., Inc., No. 7:14-CV-1244-LSC, 2015 WL 225495, at *13, *14 (N.D. Ala. Jan. 16, 2015); *Klotz*, 519 F. Supp. 2d at 436; Sneed v. Wellmark Blue Cross & Blue Shield of Iowa, No. 1:07-CV-292, 2008 WL 1929985, at *2 (E.D. Tenn. Apr. 30, 2008); Williams v. CIGNA, No. 5:10-CV-00155, 2010 WL 5147257, at *4 (W.D. Ky. Dec. 13, 2010).

147. *See, e.g., Smith*, 769 F.3d at 932 (6th Cir. 2014) (citing Sixth Circuit law upholding mandatory arbitration of ERISA claims).

148. *Id.* ("It is illogical to say that, under ERISA, a plan may preclude venue in federal court entirely, but a plan may not channel venue to one particular federal court."); *Williams*, 2010 WL 5147257, at *4; *Sneed*, 2008 WL 1929985, at *2.

149. M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972).

clauses.[150]   It should take more to override a declared policy than facile invocation of policies Congress did not declare.[151]  If section 1001(b) does not declare a "strong public policy" or if enforcing a venue-selection clause does not "contravene[]" that policy,[152] courts should simply explain why.  In either scenario, external policy considerations are mere red herrings.

Furthermore, the FAA analogy flouts core principles of statutory interpretation.  Courts enforce arbitration clauses because a federal statute compels it.[153]  Section 2 of the FAA authorizes enforcement of "[a] written provision . . . to settle by arbitration a controversy thereafter arising out of" certain contracts.[154]   While the FAA may embody a "legislative policy . . . [that] . . . strongly favors the enforcement of agreements to arbitrate,"[155] no comparable legislative policy requires courts to enforce forum selection clauses.[156]  Thus, extrapolating the enforceability of venue selection

---

150.  *See* 29 U.S.C. § 1001(b); *Bremen*, 407 U.S. at 15.

151.  Aaron v. Sec. & Exch. Comm'n, 446 U.S. 680, 695 (1980).  When the language of a statute, here section 1001(b), "is sufficiently clear in its context and not at odds with the legislative history, it is unnecessary 'to examine the additional considerations of policy . . . that may have influenced the lawmakers in their formulation of the statute.'"  *Id.*   *Cf.* Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 38 (1988) (Scalia, J., dissenting) ("In general, while interpreting and applying substantive law is the essence of the 'judicial Power' created under Article III of the Constitution, that power does not encompass the making of substantive law." (citation omitted)); *see* Jarrod Shobe, *Enacted Legislative Findings and Purposes*, 86 U. CHI. L. REV. 669, 714 (2019) ("Enacted [legislative] findings and purposes are law just like any other part of the law, and there is no reason why they should not be given the full weight of law."); *see also* Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, *in* A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 3, 17–18 (Amy Gutmann ed., 1997) ("[U]nder the guise or even the self-delusion of pursuing unexpressed legislative intents, common-law judges will in fact pursue their own objectives and desires, extending their lawmaking proclivities from the common law to the statutory field.").

152.  *See, e.g.*, *Smith*, 769 F.3d at 934 (Clay, J., dissenting).

153.  *See, e.g.*, *id.* at 935.

154.  9 U.S.C. § 2 (2012).

155.  Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 479 (1989).  *But see* Margaret L. Moses, *Statutory Misconstruction: How the Supreme Court Created A Federal Arbitration Law Never Enacted by Congress*, 34 FLA. ST. U. L. REV. 99, 123 (2006) (questioning whether the FAA established a strong policy favoring arbitration).

156.  *But see Smith*, 769 F.3d at 932 (upholding venue clause based on FAA analogy).  In declaring that arbitration clauses are "in effect, a specialized kind of forum-selection clause," however, the Sixth Circuit completely ignored the legal context that distinguishes forum selection clauses and arbitration clauses.  *Id.* (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974)).  Interestingly, in *Barrowclough*, the Third Circuit had previously held that ERISA's venue provision indeed barred the enforcement of arbitration clauses for statutory ERISA claims.  *See* Barrowclough v. Kidder, Peabody & Co., 752 F.2d 923, 941 (3d Cir. 1985).  In coming to this conclusion, the court specifically considered Congress's intention to provide "ready access" to the federal

clauses by considering the enforceability of arbitration is akin to comparing apples and orangutans.[157]

Moreover, the FAA allows parties to move cases wholly out of the court system,[158] whereas ERISA aims to ensure participants and beneficiaries have "ready access to the Federal courts."[159]  This tension, alone, makes reliance on the FAA for interpretative guidance questionable.  Since the FAA neither applies to nor even addresses forum selection clauses,[160] it neither binds nor helps with the validity query.

Judicial reliance on uncodified policies and unrelated statutes only risks undermining Congress's stated purpose of giving participants and beneficiaries the means to protect their benefit rights.[161]  Considering Congress's legislative intent coupled with its declared purpose, the policy of ERISA becomes clear: ensuring "ready access to the Federal courts."[162]

---

courts pursuant to section 1001(b).  *Id.* ("Congress further sought 'to protect . . . the interests of participants and beneficiaries, by . . . providing for appropriate remedies, sanctions, and ready access to the Federal courts.'" (quoting 29 U.S.C. § 1001(b)).  It was not until *Pritzker* that the appellate court decided that Supreme Court decisions favoring the "strong federal policy" of enforcing arbitration could not be ignored.  Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1115 (3d Cir. 1993) ("[H]owever, we have not hesitated to act when we discover that our decisions have fallen out of step with current Supreme Court jurisprudence." (citation omitted)).

157.  *See* Taylor, *supra* note 49, at 797 n.68 (1993) ("Because Congress has the authority under Article III of the United States Constitution to determine the extent of the federal courts' jurisdiction, Congress may also determine when the federal courts should decline to exercise that jurisdiction.  Such situations must be distinguished from situations in which the courts themselves decline jurisdiction, particularly when they do so to enforce an agreement of private individuals.").

158.  *See, e.g.,* Benjamin P. Edwards, *Arbitration's Dark Shadow*, 18 NEV. L.J. 427, 435 (2018) (discussing how arbitration "removes cases from public courts and public processes, casting entire fields of law into shadow"); *see also* Hugh J. Ault, *Improving the Resolution of International Tax Disputes*, 7 FLA. TAX REV. 137, 146 (2005) ("[A]rbitration ('alternative' dispute resolution) in most other contexts intentionally removes the substantive matter at issue from the domestic judicial system (though there may be a judicial review of the procedural aspects of the case).").

159.  29 U.S.C. § 1001(b) (2012); *see also* H.R. REP. NO. 93-533, at 17 (1973), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4655.

160.  *See* 9 U.S.C. § 2 (2012).

161.  *See* Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 373–74 (1986) ("Application of 'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action."); *see also* Shobe, *supra* note 151, at 714 (2019) ("Enacted [legislative] findings and purposes are law just like any other part of the law, and there is no reason why they should not be given the full weight of law.")

162.  29 U.S.C. § 1001(b) (2012); H.R. REP. NO. 93-533; *see also* Mertens v. Hewitt Assocs., 508 U.S. 248, 264 (1993) (White, J., dissenting) (acknowledging ERISA's "ready access" goal).

## B. Venue Options Throughout ERISA's Evolution

Second, the legislative history of pension reform confirms that ERISA's drafters meant for employees to have venue options that would facilitate enforcement of their benefit rights. Recognition of employees' need for broad venue options is clear from the beginnings of ERISA's evolution. In February 1967, the Johnson administration introduced legislation to impose federal fiduciary standards on people who managed plan assets.[163] Johnson's bill authorized employees to sue to enforce these standards. To facilitate enforcement, the legislation allowed for suits "in any district court of the United States and in the United States courts of any place subject to the jurisdiction of the United States where the fund is administered or where the breach took place or where the defendant is an inhabitant or may be found . . . ."[164]

Roughly three years later, in March 1970, the Nixon administration proposed a revised fiduciary standards bill that included the precise venue language that would ultimately appear in section 502(e)(2) of ERISA.[165] Like

163. *See* S. 1024, 90th Cong. § 9(h) (1967). Johnson's bill proposed federal fiduciary standards for administrators of employee benefit funds and authorized participants and beneficiaries of a fund (as well as the Department of Labor) to sue fiduciaries who breached those standards. *See id.* §§ 9(h) and 14; *see also* Wooten, *supra* note 114 at 121-23 (discussing the genesis of this bill).

164. S. 1024 § 9(h)(2); *cf.* 29 U.S.C. § 1132(e)(2) (2012) (authorizing a plaintiff to file "where the plan is administered, where the breach took place, or where a defendant resides or may be found"). Like section 1132(e)(2), the venue provision in Johnson's bill also authorized nationwide service of process. *See id.*; S. 1024 § 9(h)(2). Interestingly, one early critic of the venue language in Johnson's bill was Senator Jacob Javits, who spearheaded pension reform in Congress. About a week after Johnson's bill was introduced in the Senate, Javits introduced his own pension-reform legislation. In remarks touting his own bill, Javits claimed the venue language in Johnson's legislation was too broad. *See* 113 Cong. Rec. 4659 (1967) ("The Administration bill (S. 1024) would permit an action in any United States District Court and then allow the court's process to reach beyond the confines of its district—indeed, nationwide. The result would be that anyone could be made to respond anywhere, subject to a later motion to transfer the case to a more convenient forum."). Javits later changed his mind and endorsed the approach in Johnson's bill. *See, infra* notes 174 and 175.

165. *Compare* S. 3589, 91st Cong. § 9(b) (1970) (adding section 9(f)(2) to the Welfare and Pension Plans Disclosure Act of 1958) ("Where such an action is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found."), *with* 29 U.S.C. § 1132(e)(2) (2012) ("Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.").

Johnson's bill, Nixon's bill authorized employees to enforce its fiduciary standards.[166] In addition, Nixon's bill authorized employees to sue to recover benefits due under their plan.[167] Such actions could be brought in state or federal court,[168] and when brought in federal court, a plaintiff could sue "where the plan is administered, where the breach took place, or where a defendant resides or may be found."[169]

Explaining S. 3589, Senator Jacob Javits, who introduced the bill on behalf of the Nixon administration, noted the obstacle venue rules posed to enforcement of benefit rights and the need for improving employees' access to the federal courts.[170] "[I]n the case of plans covering employees and beneficiaries in many States," Javits observed, "service of process, venue, and jurisdictional requirements compound even further the difficulty facing individual employees who might want to institute a suit to protect their rights under present law."[171] "The administration bill which I am introducing today," he continued, "is specifically designed to remedy these defects, as well as to provide additional protections to plan participants."[172] Thus, by Javits's own words, venue options at filing were an essential component of pension reform.

The venue language in S. 3589 later reappeared in bills proposed by the Nixon Administration,[173] by Javits,[174] by Javits and Senate Labor and Public

---

166.  S. 3589 § 9(b) (adding section 9(e)(2) to the Welfare and Pension Plans Disclosure Act of 1958).

167.  *Id.* (including a new provision that authorized "a participant or beneficiary" to bring an action "to recover benefits due him under the terms of his plan or to clarify his rights to future benefits under the terms of the plan").

168.  *Id.* (adding § 9(f)(1) to the Welfare and Pension Plans Disclosure Act of 1958, as amended).

169.  *Id.* (adding § 9(f)(2) to the Welfare and Pension Plans Disclosure Act of 1958, as amended).

170.  116 Cong. Rec. 7279 (1970).

171.  *Id.*

172.  *Id.* Javits made the same statement when he introduced a similar fiduciary-standards bill for the Nixon administration in December 1971. *See* 117 Cong. Rec. 46914 (1971) ("Finally, in the case of plans covering employees and beneficiaries in many States service of process, venue, and jurisdictional requirements compound even further the difficulty facing individual employees who might want to institute a suit to protect their rights under present law. The administration bill which I am introducing today is specifically designed to remedy these defects, as well as to provide additional protections to plan participants.").

173.  S. 3024, 92d Cong. § 9(b) (1971) (adding § 9(f)(2) to the Welfare and Pension Plans Disclosure Act of 1958, as amended); S. 1557, 93d Cong. § 9(b) (1973) (adding § 9(f)(3) to the Welfare and Pension Plans Disclosure Act of 1958, as amended).

174.  S. 2, 92d Cong. § 504 (1971).

Welfare Committee chair Harrison Williams,[175] and by Congressman John Dent,[176] who led pension-reform efforts in the House Labor and Education Committee. This venue language also appeared in bills reported by the House Education and Labor Committee,[177] the Senate Labor and Public Welfare Committee,[178] and the Senate Finance Committee.[179] Indeed, after the introduction of Nixon's bill in 1970, this venue language appears in every bill addressing private enforcement of benefit rights that Congress seriously considered.[180] Finally, the language appears in the pension-reform bills passed by each chamber of Congress[181] and, again, in ERISA itself.[182]

---

175. S. 3598, 92d Cong. § 603 (1972) (as introduced in Senate, May 11, 1972); S. 4, 93d Cong. § 603 (1973) (as introduced in Senate, Jan. 4, 1973). It should be noted that Javits and Williams' major bills in the 92d and 93d Congresses did not authorize participants and beneficiaries to bring claims for benefits in the federal district "where the breach took place." See S. 3598 § 604 (as introduced in Senate, May 11, 1972); S. 4 § 604 (as introduced in Senate, Jan 4, 1973). This limitation on venue must be seen in the context of the overarching enforcement strategy of the legislation. These bills placed the primary burden for enforcing employee benefit rights on a government agency—the Department of Labor—and authorized the Department to bring benefit claims on behalf of participants and beneficiaries. See S. 3598 § 602 (as introduced in Senate, May 11, 1972); S. 4 § 602 (as introduced in Senate, Jan 4, 1973). For discussion of the enforcement strategy of these bills, see Hearing, supra note 119, at 110 (statement of Frank Cummings, attorney, Gall, Lane & Powell).

176. H.R. 1269, 92d Cong. § 106(g)(2) (1971); H.R. 2, 93d Cong. § 503(g)(2) (as introduced in House, Jan. 3, 1973).

177. See H.R. 2 § 503(g)(2) (as reported by H. Comm. on Educ. & Labor, Oct. 2, 1973).

178. See S. 4 § 603 (as reported by S. Comm. on Labor & Pub. Welfare, Apr. 18, 1973).

179. S. 1179, 93d Cong. § 501(d)(4) (1973). The venue clause in section 501(d)(4) applied to fiduciary breach claims but not to claims for benefits. As in the case of Javits and Williams's bills, the Finance Committee's failure to propose broader venue options for such claims must be seen in light of the broader enforcement strategy of the Finance Committee's bill. Section 602 of the bill proposed an entirely new enforcement regime for benefit claims, authorizing the Secretary of Labor "to hear and decide disputes arising under qualified plans . . . with respect to the present or future benefits of such participants or their beneficiaries, upon application made by any such participant or beneficiary." Id. § 602(a) (as reported August 21, 1973). The committee proposed this administrative regime because of doubts about whether employees could effectively enforce benefit claims in the courts even if Congress enhanced their access to the courts. See S. REP. NO. 93-383, at 116-17 (1973), as reprinted in 1974 U.S.C.C.A.N. 4889, 4890.

180. Congress gave serious consideration to some bills that did not address enforcement of benefit rights. See, e.g., S. 1179 (as introduced in Senate, Mar. 13, 1973).

181. H.R. 2 § 693 (as passed by Senate, Mar. 4, 1974); H.R. 2 § 503(g)(2) (as passed by House, Oct. 2, 1973). The enforcement provisions of the Senate version of H.R. 2 derived from Javits and Williams's bills, so it too did not authorize employees to sue to enforce benefit claims in the federal district "where the breach took place." See H.R. 2 § 694 (as passed by Senate, Mar. 4, 1974); see also supra note 175.

182. Employee Retirement Income Security Act (ERISA) of 1974, § 502(e)(2), 29 U.S.C. § 1132(e)(2) (2012).

Congressional reports further confirm ERISA drafters' policy goal of clearing procedural hurdles. House and Senate Labor Committee reports use identical language to describe the procedural reforms in their bills:

> The intent of the Committee is to provide the full range of legal and equitable remedies available in both state and federal courts and to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary responsibilities under state law or recovery of benefits due to participants. For actions in federal courts, nationwide service of process is provided in order to remove a possible procedural obstacle to having all proper parties before the court.[183]

The report of the Finance Committee also notes that the Committee's bill established "[l]iberal venue and service provisions . . . for actions brought in Federal district court."[184] In sum, while pension reformers disagreed about some things, they were unanimous in their belief that employees needed broad venue options to enforce their benefit rights effectively.

## C.    ERISA in Historical Context

The historical context in which ERISA was drafted further suggests forum selection clauses are unenforceable.[185] As Judge Torreson from the District Court of Maine notes, "[w]hat Congress intended by offering venue choices to participants and beneficiaries is best understood in light of the climate that existed in 1974 when ERISA was enacted."[186] As this Subpart explains, given the state of the law in 1974, ERISA's drafters had every reason to believe section 1132 would control venue in pension benefit actions. Forum selection clauses were not on the radar of drafters or pension benefit

---

183.   S. REP. NO. 92-1150, at 43 (1972); S. REP. NO. 93-127, at 35 (1973), as *reprinted in* 1974 U.S.C.C.A.N. 4838, 4838; H.R. REP. NO. 93-533, at 17 (1973), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4655.

184.   S. REP. NO. 93-383, at 106 (report on S. 1179).

185.   The value of historical context for statutory interpretation is well-established. *See supra* note 108.

186.   Dumont v. PepsiCo, Inc., 192 F. Supp. 3d 209, 222 (D. Me. 2016); *accord* Melvin Aron Eisenberg, *Strict Textualism*, 29 LOY. L.A. L. REV. 13, 35 (1995) ("[P]urposeful words, like those of statutes, have no intelligible meaning out of the context of the applicable legal, social, and historical propositions in which the words were written. Words out of context are like fish out of water—dead or dying."); Bradford C. Mank, *Legal Context: Reading Statutes in Light of Prevailing Legal Precedent*, 34 ARIZ. ST. L.J. 815, 868 (2002) ("While contemporary legal context should not always be the most important factor in statutory interpretation, courts should consider the state of the law at the time of a statute's enactment as a relevant factor in interpreting it." (footnote omitted)).

experts. Rather, the prevailing presumption was such clauses would not be enforced, as evidenced by pension benefit litigation pre-ERISA.[187] This much-needed historical context clarifies why ERISA drafters did not explicitly discuss forum selection clauses. Because such clauses were presumed to be unenforceable, there was no reason for ERISA to address them.

### 1. Pre-ERISA Law Voided Forum Selection Clauses

ERISA's drafters and the specialists who managed employee-benefit plans presumed courts would not allow terms in the governing documents of a benefit plan to supersede a statutory grant of venue options. Such a presumption would have been wholly in line with the prevailing law during the period ERISA was enacted. No pre-ERISA employee benefits cases appear to invoke such clauses, which is unsurprising given the then-existing state of the law.[188]

Moreover, at the time ERISA percolated through Congress, Supreme Court authority held statutory provisions overrode attempts to contractually select a court.[189] In the 1949 decision, *Boyd v. Grand Trunk Western Railroad Company*,[190] the Court refused to enforce a forum selection clause that conflicted with a provision in the Federal Employers' Liability Act (FELA or the Act).[191] The plaintiff, a railroad employee, suffered a work-related

---

187. *See infra* Subpart II.C.2 (discussing historical case law).

188. Forum selection clauses appear not even to have been a "rarity" when Congress passed ERISA. *See* Turner v. Sedgwick Claims Mgmt. Servs., Inc., No. 7:14-CV-1244-LSC, 2015 WL 225495, at *21 (N.D. Ala. Jan. 16, 2015) ("[I]t does not appear that issues related to forum-selection clauses in ERISA plans began appearing in the caselaw until about the mid–2000's, and those cases suggest that the forum-selection clauses had been added by amendments made around that same period." (citation and footnote omitted)). *Cf.* CompuCredit Corp. v. Greenwood, 565 U.S. 95, 103 (2012) (upholding arbitration clause in Credit Report Organization Act (CROA) case because "[a]t the time of the CROA's enactment in 1996, arbitration clauses in contracts of the type at issue here were no rarity"). The earliest case discovered discussing a forum selection clause in an employee benefit plan is Green v. Picker Corp., No. 38621, 1979 WL 210070 (Ohio Ct. App. Mar. 29, 1979). The Trust Agreement for the plan required suit in New York. *Id.* at *2. Citing *Bremen*, the Court of Appeals of Ohio held it "unreasonable to require [Plaintiff, a former employee], whose financial resources are far less than those of Picker Corporation, to bring this action in New York when he worked for the corporation in Ohio, and the parties to the lawsuit, appellant, the corporation, and the five members of the Retirement Income Plan Committee, are all Ohio residents, subject to the jurisdiction of the Ohio courts." *Id.*

189. Boyd v. Grand Trunk W. R. Co., 338 U.S. 263 (1949).

190. *Id.*

191. *Id.* at 264–65.

injury.[192]   His employer advanced him money twice in the following months.[193]   With each advancement, the employee signed an agreement that contained a forum selection clause.[194]   He subsequently sued his employer under FELA to recover for the injuries suffered.[195]   The venue provision in FELA gave employees who sued in federal courts three options: "in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action."[196]

In a concise decision, the Court held that a contractual forum selection clause could not override the statutory policy.[197]   Even though the statute at issue did not expressly forbid forum selection clauses, the Court justified its holding as necessary to ensure the Act would "have the full effect that its comprehensive phraseology implies."[198]   In doing so, the Court recognized that forum selection clauses compromise an employee's right to select a venue provided by statute.[199]   The Court equated forum selection clauses with a device to limit a potential employee's right to sue, characterizing the clause as "a device which obstructs the right of the [FELA] plaintiff to secure the maximum recovery if he should elect judicial trial of his cause."[200]   Hence, in

---

192.  *Id.* at 263.

193.  *Id.*

194.  *Id.* at 263–64.

195.  *Id.*

196.  *Id.* at 265 (quoting Federal Employers' Liability Act).

197.  *Id.* at 266 ("28 U.S.C. § 1404(a) . . . 'does not limit or otherwise modify any right granted in § 6 of the Liability Act or elsewhere to bring suit in a particular district.'") (citation omitted).

198.  *Id.* at 265 (quoting Duncan v. Thompson, 315 U.S. 1, 6 (1942)).  In a decision issued the same term, the Court held that defendants can still pursue venue transfer under 28 U.S.C. § 1404 without violating the Act's statutory venue provision.  *Ex parte* Collett, 337 U.S. 55, 60 (1949).  Such arguments, however, are distinct from arguments to enforce a forum selection clause.

199.  *Boyd*, 338 U.S. at 266 ("The right to select the forum granted in § 6 is a substantial right. It would thwart the express purpose of the Federal Employers' Liability Act to sanction defeat of that right by the [forum selection clause].").

200.  *Id.* (footnote omitted).  Some courts argue that *Boyd* is not controlling simply because of the wording of the Liability Act.  *See, e.g.*, Mroch v. Sedgwick Claims Mgmt. Servs., Inc., No. 14-CV-4087, 2014 WL 7005003, at *3 n. 1 (N.D. Ill. Dec. 10, 2014) ("But the plain language in [the FELA] is mandatory, "*shall* to that extent be void"; and, thus, the analysis in *Boyd* is . . . inapplicable to ERISA's permissive language . . . .").  *Boyd*, however, turned on the purpose of the Liability Act, which was to prevent a defendant's from "exempt[ing] itself from any liability created by [the] Act."  *Boyd*, 338 U.S. at 265 (quoting Federal Employers' Liability Act).  The Boyd decision does not discuss Congress's word choice of "shall" versus "may" in reaching its holding.  Similarly, for the purpose of ERISA, the use of the word "may" is irrelevant.  Rather, the declared policy

accord with several lower decisions,[201] the Court refused to enforce the provision.[202]

In the years leading up to ERISA's passage, federal circuit and district courts faithfully applied the principles in *Boyd*. For example, the First Circuit in 1966 declared that a statutory venue provision "cannot so easily be thwarted" by a contractual forum selection clause.[203] Similar conclusions were reached by federal district courts in the 1960s and early 1970s when they assessed venue selection clauses that conflicted with the venue provision of the Miller Act.[204]

This context sheds light on the drafter's silence on such clauses in ERISA. As evidenced from scholars' writings pre-ERISA, the caselaw was notably clear: a contractual forum selection clause was not enforceable in the face of a federal statute that expanded a plaintiff's venue options.[205] Given *Boyd* and

---

providing potential plaintiffs "ready access to the Federal courts" is controlling. *See* 29 U.S.C. § 1001(b) (2012).

201. *See Boyd*, 338 U.S. at 264 n.3 (1949) (listing cases).

202. *Id.* at 264–65.

203. Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 439 (1st Cir. 1966) (citing *Boyd*, 338 U.S. 263). Notably, the statutory venue provision in question, like ERISA's, uses "may." 15 U.S.C. § 1222 (2012) ("An automobile dealer *may* bring suit . . . .") (emphasis added).

204. U.S. *ex rel.* Gigliello v. Sovereign Const. Co., 311 F. Supp. 371, 373 (D. Mass. 1970) ("Parties cannot by contract oust the District Court of the jurisdiction conferred upon it."); U.S. *ex rel.* Ray Gains, Inc. v. Essential Constr. Co., 261 F. Supp. 715, 720 (D. Md. 1966) ("Since the use plaintiff would not be entitled to its Miller Act rights in the New York state courts, such forum cannot do substantial justice to its cause of action."); U.S. *ex rel.* Vt. Marble Co. v. Roscoe-Ajax Constr. Co., 246 F. Supp. 439, 443 (N.D. Cal. 1965) ("[T]he only district in which the action may properly be brought under the Miller Act is the Northern District of California and . . . the parties cannot by their contract prescribe a different jurisdiction . . . ."); *see also* Lukas A. Anton, C.H. Robinson Worldwide, Inc. v. FLS Transportation, Inc.: *How Minnesota's Closely-Related-Party Doctrine Undermines Long-Settled Principles of Contract Law*, 35 HAMLINE L. REV. 497, 521 & n.178 (2012) (discussing the impact of these decisions); Gruson, *supra* note 39, at 173–79 ("Statutory Restrictions on Forum Selection Clauses").

205. *See, e.g.*, B. Nathaniel Richter & Lois G. Forer, *Proposed Changes in the Laws Governing Injuries in Interstate Transportation*, 67 HARV. L. REV. 1003, 1012 (1954) ("The importance of the plaintiff's right to choose his forum was deemed so substantial that agreements between employee and carrier limiting the jurisdictions in which the employee might sue are invalid."); B. Nathaniel Richter & Lois G. Forer, *Federal Employers' Liability Act*, 12 FED. RULES DECISIONS 13, 61 (1952) ("An agreement entered into by an employee with the carrier to bring suit only in the jurisdiction where the employee resided or where the injury was sustained was invalidated as being in violation of Section 5 of the Act." (footnote omitted)); *see also* David Marcus, *The Perils of Contract Procedure: A Revised History of Forum Selection Clauses in the Federal Courts*, 82 TUL. L. REV. 973, 1011 (2008) ("Statutes that specifically afforded plaintiffs access to a particular venue precluded clause enforcement . . . .").

its progeny, ERISA drafters would have logically assumed a statutory grant of venue choices would supersede a contractual forum selection provision.[206]

The Supreme Court's 1972 decision to uphold a forum selection clause in *M/S Bremen v. Zapata Off-Shore, Co.* does not alter this conclusion.[207] Rather than a tidal shift toward contractual autonomy,[208] *The Bremen* was an extension of earlier admiralty cases where forum selection clauses had roots back to the late 1770s.[209] Every Supreme Court decision to this point had rejected forum selection clauses as improper attempts to contractually override judicial authority.[210] The Court still acknowledged that forum selection was historically disfavored as "contrary to public policy."[211] Further, the Court recognized that this position "still ha[d] considerable acceptance."[212] That said, the Court was willing to break from this tradition for the specific international towage contract at issue in the case.[213]

Essentially, the Supreme Court addressed different venue queries in *Boyd* and *The Bremen*.[214] If a controlling statute already determined venue,

---

206.  *See Boyd*, 338 U.S. at 266; *see also Volkswagen Interamericana*, 360 F.2d at 439.

207.  M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 20 (1972).

208.  *See infra* notes 226–230 and accompanying text; *see also* Patrick J. Borchers, *Forum Selection Agreements in the Federal Courts After* Carnival Cruise: *A Proposal for Congressional Reform*, 67 WASH. L. REV. 55, 58 (1992) ("Because *Bremen* was an admiralty case, there was a serious question as to whether its standards were limited to that context, or were applicable to federal question and diversity actions as well." (footnote omitted)).

209.  *See, e.g.*, Thompson v. Catharina, 23 F. Cas. 1028 (D. Pa. 1795). For a thorough discussion of the historical application of forum selection clauses in admiralty cases, *see* David Marcus, *The Perils of Contract Procedure: A Revised History of Forum Selection Clauses in the Federal Courts*, 82 TUL. L. REV. 973 (2008). In fact, Chief Justice Burger's opinion, explicitly defines the parameters of the holding, stating "[w]e believe this is the correct doctrine to be followed by federal district courts sitting in admiralty." *Bremen*, 407 U.S. at 10.

210.  *See, e.g.*, Baltimore & Ohio R. Co. v. Kepner, 314 U.S. 44, 54 (1941) ("A privilege of venue, granted by the legislative body which created this right of action, cannot be frustrated for reasons of convenience or expense."); *accord Boyd*, 338 U.S. at 266; Home Ins. Co. v. Morse, 87 U.S. 445, 451 (1874) ("[A]greements in advance to oust the courts of the jurisdiction conferred by law are illegal and void.").

211.  *Bremen*, 407 U.S. at 9 ("Forum-selection clauses have historically not been favored by American courts. Many courts, federal and state, have declined to enforce such clauses on the ground that they were 'contrary to public policy,' or that their effect was to 'oust the jurisdiction' of the court." (footnote omitted)).

212.  *Id.* at 10.

213.  *Id.* at 15 ("Thus, in the light of present-day commercial realities and expanding international trade . . . the forum clause should control absent a strong showing that it should be set aside.").

214.  The Southern District Court of New York explained the coexistence of the two cases. In *City of New York v. Pullman, Inc.*, the court acknowledged that "[a]greements entered into by knowledgeable parties in an arm's-length transaction that contain a forum

parties could not contractually agree to a venue under *Boyd*.[215]  In the absence of such a statute, and within the limited confines of narrowly defined contractual agreements, *The Bremen* applied.[216]  Nonetheless, *The Bremen* reinforces the underlying principles in *Boyd*.[217]  The decision cites *Boyd*[218] and reaffirms that a "contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared *by statute* or by judicial decision."[219]

Congress had little reason to think *The Bremen* would undo its statutory work providing plaintiffs "ready access" to enforce pension benefits.[220] Subsequent lower court decisions reinforced a narrow interpretation of *The Bremen*.[221]  Lower court decisions that read *The Bremen* more broadly to apply to all commercial cases come out well after ERISA's enactment.[222]  Even the

---

selection provision are enforceable absent a showing of fraud, overreaching, unreasonableness or unfairness."  City of New York v. Pullman, Inc., 477 F. Supp. 438, 441 n.10 (S.D.N.Y. 1979) (citing *Bremen*, 407 U.S. 1).  "[A] contractual choice of forum clause," however, "is unenforceable if its enforcement would contravene a strong policy of a forum in which suit is brought, whether declared by statute or by judicial decision." *Id.* (citing *Boyd*, 338 U.S. 263).

215.  *See, e.g.*, Jeremy Jones, *Forum and Venue Selection Clauses in Seamen's Employment Contracts: Can Contractual Stipulations be Used to Defeat a Seaman's Choice of Forum or Venue in a Jones Act Claim?*, 85 Tul. L. Rev. 519, 530 (2010) (explaining "the continued vitality of *Boyd*" should be recognized "despite the general trend toward enforcing forum and venue selection clauses following *Bremen*"; the author further notes that "*Bremen* cites *Boyd* as an example of a public policy that would mandate holding a forum selection clause unenforceable" (footnote omitted)).

216.  *See Bremen*, 407 U.S. at 15 (citing *Boyd*, 338 U.S. 263).

217.  *See* Jones, *supra* note 215, at 530.

218.  *Bremen*, 407 U.S. at 15.

219.  *Id.* (citing *Boyd*, 338 U.S. 263) (emphasis added).

220.  *See* 29 U.S.C. § 1001(b) (2012).

221.  *See* Green v. Picker Corp., No. 38621, 1979 WL 210070 (Ohio Ct. App. 1979); Copperweld Steel Co. v. Demag-Mannesmann-Boehler, 354 F. Supp. 571, 573 (W.D. Pa. 1973) (holding that *Bremen* did not apply because "the reason for the policy behind *M/S Bremen* does not exist here," and further noting that "the Supreme Court appears to be telling us to apply *M/S Bremen* in admiralty cases"); Smith, Valentino & Smith, Inc. v. Sup. Ct., 551 P.2d 1206 (Cal. 1976) (the majority and dissenting opinions disagree about whether the scope of *The Bremen* extends past admiralty cases); Case Comment, *Forum Selection Clauses in Contracts Governing Multinational Transactions*, 86 Harv. L. Rev. 52, 56 (1972) ("The *Zapata* decision pronounces only federal admiralty law.").

222.  *See, e.g.*, Hoffman v. Nat'l Equip. Rental, Ltd., 643 F.2d 987, 989 n.2 (4th Cir. 1981) (citing to *Bremen* in non-admiralty action); *In re* Fireman's Fund Ins. Cos., 588 F.2d 93, 95 (5th Cir. 1979) ("While *The Bremen* dealt with admiralty matters, its teaching is appropriate for the situation in the instant [Miller Act] case."); Farrington v. Centrust Mortg. Corp., No. 88-2633-WF, 1989 WL 120698, at *1 (D. Mass. Oct. 2, 1989) (applying *Bremen* to a domestic employment agreement); C. Pappas Co. v. E. & J. Gallo Winery, 565 F. Supp. 1015, 1017 (D. Mass. 1983); D'Antuono v. CCH Computax Sys., Inc., 570 F. Supp. 708,

Supreme Court seemed to retreat from a more expansive application of *The Bremen* in 1988.[223]  It was not until 1991, seventeen years after ERISA was enacted, that the Court shifted toward upholding forum selection clauses in contracts of adhesion.[224]

In upholding ERISA venue clauses, some courts reject *Boyd*'s direct application, deeming it a relic of "an era of marked judicial suspicion of contractual forum selection."[225]  *Boyd's* utility as a relic, however, is what matters for understanding why ERISA's drafters saw no need to expressly negate forum selection clauses.[226]  The argument here is distinct from straight stare decisis principles.[227]  *Boyd* may be a governing precedent.[228]  But even if it is not now, it was in 1974 and would have informed what the legislature believed when it passed ERISA.[229]  The decision sheds light on why ERISA drafters did not expressly negate forum selection clauses.  Such an express declination was simply unnecessary at the time of drafting.[230]  This would have

---

711 (D.R.I. 1983); Joseph A. Grundfest & Kristen A. Savelle, *The Brouhaha over Intra-Corporate Forum Selection Provisions: A Legal, Economic, and Political Analysis*, 68 Bus. Law. 325, 383 n.258 (2013) (citing post–*Bremen* decisions).

223.  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 28 (1988) (citing Tex. Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641-642 (1981) for the proposition that "federal common law developed under admiralty jurisdiction [is] not freely transferable to [the] diversity setting").  The Court goes on to say:

> [W]e disagree with the court's articulation of the relevant inquiry as "whether the forum selection clause in this case is unenforceable under the standards set forth in *The Bremen*."  Rather, the first question for consideration should have been whether § 1404(a) itself controls respondent's request to give effect to the parties' contractual choice of venue and transfer this case to a Manhattan court.  For the reasons that follow, we hold that it does.

*Id.* at 28–29 (internal citations omitted).

224.  Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585 (1991).

225.  *In re* Mathias, 867 F.3d 727, 733 (7th Cir. 2017).

226.  *See* Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 439 (1st Cir. 1966) (reiterating the declaration from *Boyd* that a statutory venue provision cannot "easily be thwarted" by a forum selection clause); Case Comment, *supra* note 221, at 56 ("The *Zapata* decision pronounces only federal admiralty law.").

227.  Though, under such principles, the argument that *Boyd* controls in the ERISA context remains colorable.  *Boyd* is the Supreme Court's only decision squarely addressing when a federal statute voids a forum selection clause.  *See* Boyd v. Grand Trunk Western Railway Co., 338 U.S. 263, 266 (1949).

228.  The Supreme Court has never overruled the decision.  It last cited the decision in *Evans v. Jeff D.*, 475 U.S. 717 (1986), though a circuit court has favorably cited it most recently in *Liles v. Ginn-La West End, Ltd.*, 631 F.3d 1242, 1251 (11th Cir. 2011).

229.  *See Boyd*, 338 U.S. at 266 ("The right to select the forum granted in [statute] is a substantial right.").

230.  *See* M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972) ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong

been particularly true when employees had little choice but to adhere to the employers' terms because, at the time, a forum selection clause in a contract of adhesion was unenforceable.[231]

Nonetheless, courts enforcing venue selection clauses in ERISA cases commonly point to ERISA's failure to explicitly negate such clauses as a justification for enforcing them. For example, the Sixth Circuit argues in *Smith v. AEGON Companies Pension Plan* that "if Congress had wanted to prevent private parties from waiving ERISA's venue provision, Congress could have specifically prohibited such action."[232] But silence, alone, is indeterminate and equally supports invalidating such clauses.[233] As the court states in *Dumont v. Pepsico, Inc.*, "the flip side of this argument also holds true: if Congress had wanted to allow forum selection clauses, it could have expressly permitted them."[234] Courts should replace silence with evidence, because without evidence they run the risk, in Justice Scalia's words, "of projecting current attitudes upon the helpless past."[235]

## 2. Contemporary Pension Benefit Actors Presumed Unenforceability

The actions of benefits professionals and legislators active in pension reform reveal a shared presumption that forum selection clauses were unenforceable. Parties who undertook pension benefit litigation pre-ERISA appear to have presumed that a court would not enforce forum selection

---

public policy of the forum in which suit is brought, whether declared by statute or by judicial decision.") (citing *Boyd*, 338 U.S. 263).

231. Willis L. M. Reese, *The Supreme Court Supports Enforcement of Choice-of-Forum Clauses*, 7 INT'L LAW. 530, 535-56 (1973) ("It seems likely that the courts will continue to follow earlier cases holding that effect should be denied choice-of-forum clauses contained in insurance and other form contracts."); Gruson, *supra* note 39, at 166 ("If the agreement containing the forum-selection clause is a contract of adhesion, the clause would not be enforceable.").

232. Smith v. Aegon Cos. Pension Plan, 769 F.3d 922, 931 (6th Cir. 2014) (citing Bernikow v. Xerox Corp. Long-Term Disability Income Plan, No. CV 06-2612 RGKSHX, 2006 WL 2536590, at *2 (C.D. Cal. Aug. 29, 2006)); *see also In re* Mathias, 867 F.3d 727, 732 (7th Cir. 2017) ("Nothing in [the] text [of § 1132(e)(2)] *expressly* invalidates forum-selection clauses in employee-benefits plans." (emphasis in original); *Bernikow*, 2006 WL 2536590, at *2 ("Had Congress sought to prevent plaintiffs from waiving the statutory venue provision by private agreement, it could have done so by express provision.").

233. Perhaps such a result is why the Ninth Circuit cautions against reliance on statutory silence. *See* Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 717 (9th Cir. 2004) ("The district court's interpretation attempts to divine congressional intent from congressional silence, an enterprise of limited utility that offers a fragile foundation for statutory interpretation.") (citation omitted).

234. Dumont v. Pepsico, Inc., 192 F. Supp. 3d 209, 211 (D. Me. 2016).

235. Mertens v. Hewitt Assocs., 508 U.S. 248, 257 n.7 (1993).

clauses. This evidence shows why Congress would have had no reason to think venue selection clauses could override venue options under section 1132(e)(2).

For example, consider the legal gymnastics defense counsel for United Mine Workers Welfare and Retirement Fund (the Fund) undertook.[236] Beginning in the late 1940s miners sought to recover retirement benefits from the Fund.[237] Many sued where they resided.[238] There followed twenty years of jurisdictional skirmishing over where such cases ought to be heard.[239] In many of these cases, the Fund moved to dismiss suits filed outside the District of Columbia, contending it was a trust of movables.[240] Under the trust of movables doctrine, suits involving trust administration could be brought only in the situs of the trust.[241] The Fund argued payment of retirement benefits was trust administration, which would mean retirees could only sue in the District of Columbia where the Fund was organized.[242] Though the Fund enjoyed initial success,[243] the courts ultimately rejected the trust of movables

---

236. For a discussion of the history and creation of the Fund, see Richard P. Mulcahy, A Social Contract for the Coal Fields: The Rise and Fall of the United Mine Workers of America Welfare and Retirement Fund 12-22 (2001); see also Van Horn v. Lewis, 79 F. Supp. 541 (D.D.C. 1948).

237. See, e.g., George v. Lewis, 228 F. Supp. 725 (D. Colo. 1964); Pavlovscak v. Lewis, 168 F. Supp. 839 (W.D. Pa. 1958); Hobbs v. Lewis, 270 S.W.2d 352 (Tenn. 1954); Kane v. Lewis, 125 N.Y.S.2d 544 (N.Y. App. Div. 1953); see also Mulcahy, supra note 236, at 22 (noting fund began issuing pension checks in 1948).

238. See, e.g., Miller v. Davis, 507 F.2d 308 (6th Cir. 1974) (plaintiffs were residents of Kentucky who brought suit in Federal District Court of Kentucky); Hobbs, 270 S.W.2d at 352 (plaintiff was a resident of Tennessee, case was brought in Tennessee State Court).

239. See supra notes 237–238 (including cases as early as 1954 and as late as 1974).

240. See Hobbs, 270 S.W.2d at 353 (defendant argued that because "the trust in question is one of movables with its situs in Washington," the case must be heard "by a court having jurisdiction within the territory in which the situs of the trust is located, to wit, a court in Washington, D.C.") (internal quotation marks omitted).

241. See Restatement (First) of Conflict of Laws § 299 (Am. Law. Inst. 1934) ("The administration of a trust of movables is supervised by the courts of that state only in which the administration of the trust is located."); see also Hobbs, 270 S.W.2d at 353 (stating that "the situs of the administration of the trust is the proper forum for all actions by or against the trustees").

242. See Hobbs, 270 S.W.2d at 353–54.

243. See, e.g., id. at 354 ("Since the situs of this trust of movables is at Washington, D.C., it seems necessary to hold, both by reason of principle as well as persuasive precedent, that the Courts of Tennessee have no jurisdiction to entertain Hobbs' suit for any purpose connected with the administration of that trust.").

doctrine.[244]  The last of these cases was not decided until November 1974, two months after Congress passed ERISA.[245]

The Fund's twenty years of litigation make little sense were forum selection clauses enforceable pre-ERISA.  If it had been understood that courts would enforce a forum selection clause against employees in a benefit plan, why did the Fund's lawyers not add such a clause to the Fund's governing documents?  The Fund had competent counsel.[246]  If the Fund's attorneys had reason to believe such a clause even might have been enforced, they certainly would have added one.[247]  It would have been a lot cheaper to add a forum selection clause than to litigate the trust of movables doctrine for two decades.

---

244. Rittenberry v. Lewis, 222 F. Supp. 717, 721–22 (E.D. Tenn. 1963), *aff'd*, 333 F.2d 573 (6th Cir. 1964) ("When a trust seeks to operate upon a nationwide basis, as does the Welfare Fund here, with 1,500,000 beneficiaries scattered across the nation, it is difficult to understand how a rule of convenience in the law of administration of trusts could so dominate the judicial mind as to cause it to disregard the rights and convenience of 1,500,000 beneficiaries across the nation in favor of a rule that accords a theoretical uniformity of instruction to the trustee.") (footnote omitted).  Upon affirming the case on appeal, a very different Sixth Circuit than the one that decided *Smith v. Aegon* found itself in "full agreement" and thus saw no need "to rewrite such an opinion and deprive the trial court of its careful consideration of the issues and arguments, and complete determination of the cause."  Rittenberry v. Lewis, 333 F.2d 573, 574 (6th Cir. 1964) (quoting Patrol Valve Co. v. Robertshaw-Fulton Controls Co., 210 F.2d 146, 146 (6th Cir. 1954)).

245. Miller v. Davis, 507 F.2d 308 (6th Cir. 1974).

246. *See, e.g.*, *Longtime Lawyer E.H. Rayson Jr. Dies*, KNOX NEWS (Jan. 11, 2017, 1:50 PM), https://www.knoxnews.com/story/news/local/tennessee/2017/01/11/longtime-lawyer-eh-rayson-jr-dies/96446956 [https://perma.cc/JS6H-JP5H]; *Edward Carey, SSA Law Judge, Dies at Home*, WASH. POST (Oct. 19, 1983), https://www.washingtonpost.com/archive/local/1983/10/16/edward-carey-ssa-law-judge-dies-at-home/5b3464aa-7505-488e-8fc9-4e1527cc9453/?noredirect=on&utm_term=.f98fcd94001a [https://perma.cc/5ZWH-7JPE]; *Hopkins, Welly K., 1898-1994*, LBJ PRESIDENTIAL LIBRARY, https://discoverlbj.org/item/hopkinswk [https://perma.cc/KE2Q-G4XD].

247. The trust governing the Fund granted the trustees extensive powers.  One term read as follows:

> Subject to the stated purposes of this Fund, the trustees shall have full authority, within the terms and provisions of the "Labor-Management Relations Act, 1947," and other applicable law, with respect to questions of coverage and eligibility, priorities among classes of benefits, amounts of benefits, methods of providing and arranging for provisions for benefits, investment of trust funds, and all other related matters.

Dersch v. United Mine Workers of Am. W. & R. Fund, 309 F. Supp. 395, 396–97 (S.D. Ind. 1969) (internal quotation marks omitted).  It is important to recall that trust lawyers often wrote terms to override general provisions of trust law at this point in time.  *See* H.R. REP. NO. 93–533, at 12 (1973), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4655; *Pension and Welfare Plans: Hearing before the Subcomm. on Labor of the S. Comm. on Labor & Pub. Welfare*, 90th Cong. 227 (1968) (statement of Thomas Donahue, Assistant Secretary, U.S. Department of Labor).  Similarly, if the fund attorneys thought they could have drafted their way around venue problems, they would have done so.

The Fund's behavior is only rational if the lawyers presumed adding such a clause would have been futile.[248]

Like the fund's litigation strategy, the conduct of people involved in the legislative process reveals a similar presumption.[249] The legislative and executive branch officials who drafted bills with broad venue language endorsed it as a means of "remov[ing] . . . procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary responsibilities under state law for recovery of benefits due to participants."[250] Other commentators sought to modify the language to make it even broader. For example, the National Senior Citizens Law Center claimed the venue clauses in the various pension-reform bills were "definitely slanted against the average plan participant" and recommended expanding permitted venues to include the district in which the plaintiff resided.[251]

If advocates for broader venue options had suspected courts would enforce forum selection clauses, they would have demanded express language to prevent this. As current events show, anything less would have been insufficient to protect employees. The same goes for drafters of the leading bills because venue selection clauses would undermine the "ready access" they sought to provide. The best inference from ERISA's legislative history and the conduct of benefit professionals is that Congress failed to expressly address forum selection clauses in ERISA because these clauses were not, and were understood not to be, enforceable.[252]

---

248. As the Seventh Circuit stated, these cases are from "an era of marked judicial suspicion of contractual forum selection." *In re* Mathias, 867 F.3d 727, 733 (7th Cir. 2017).

249. Venue selection clauses appear not to have been mentioned at all during the lead-up to ERISA. In its amicus brief to the Sixth Circuit, the Department of Labor writes that "[t]here is no legislative history specifically concerning forum selection clauses as far as we have been able to ascertain." Brief of the Secretary of Labor as Amicus Curiae in Support of Plaintiff/Appellant and Urging Reversal, Smith v. Aegon Cos. Pension Plan, 769 F.3d 922 (6th Cir. 2014) (No. 13-5492), 2013 WL 4401190, at 22 n.4 (Aug. 12, 2103). Our own efforts have had the same result.

250. H.R. Rep. No. 93-533, at 17 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4655; S. Rep. No. 93-127, at 35 (1973), as *reprinted in* 1974 U.S.C.C.A.N. 4838, 4838; S. Rep. 92-1150, at 43 (1972); *see also* 116 Cong. Rec. 7279 (1970) (statement of Sen. Javits).

251. H. Ways & Means Comm., 93d Cong., Written Statements Submitted by Interested Organizations and Individuals on H.R. 10470, "Retirement Income Security for Employees Act," 15, 18, 787 (Comm. Print 1973) (including statements by the National Senior Citizens Law Center and AARP).

252. *See supra* Part II.C and accompanying notes.

## III.   READING ERISA TO PROTECT THE INTERESTS OF EMPLOYEES

Forum selection clauses not only conflict with ERISA's policy, they also conflict with its text.  As this section explains, the express language of section 1132 affords plan participants the choice of venue options at filing.  Since forum selection clauses remove participants' choice at filing, a literal application of the text prohibits them.  Arguments to the contrary improperly strain the text of ERISA, thus compromising ERISA's "policy . . . to protect . . . the interests of [employees] . . . .by providing for . . . ready access to the Federal courts."[253]

The text of section 1132 rebalances the legal entitlements generally associated with federal venue.[254]  Constitutionally, a plaintiff may choose any forum that satisfies subject matter and personal jurisdiction requirements.[255] The general venue statute in 28 U.S.C. section 1391 provides defendants with a counterbalance, giving them a mechanism to limit the plaintiff's range of otherwise constitutional filing options.[256]  While some special statutory venue provisions confirm this jurisdictional balance,[257] others recalibrate a defendant's check by expanding or narrowing a plaintiff's range of venue options.[258]   By narrowing where a plaintiff may sue, a statutory venue provision enlarges a defendant's checking power.[259]   In contrast, a statutory

---

253.  29 U.S.C. § 1001(b) (2012).
254.  *See* 29 U.S.C. § 1132(e)(2) (2012) (affording broader venue options than available under section 1391 at enactment); *see also* Varsic v. U.S. Dist. Ct., 607 F.2d 245, 248 (9th Cir. 1979) (stating that Congress "clearly struck the balance in favor of liberal venue" in enacting ERISA).

255.  *See* Watson McDaniel Co. v. Nat'l Pump & Control, Inc., 493 F. Supp. 18, 21 (E.D. Pa. 1979) ("The test for venue is not the minimal contacts with the forum state required for constitutional procedural due process, but rather the venue statute enacted by Congress.").

256.  *See* Young Again Prods. v. Acord, 459 F. App'x 294, 306 (4th Cir. 2011); U.S. v. Meade, 110 F.3d 190, 200 (1st Cir. 1997); Myers v. Am. Dental Assoc., 695 F.2d 716, 732 (3d Cir. 1982); Concession Consultants, Inc. v. Mirisch, 355 F.2d 369, 371 n.1 (2d Cir. 1966) ("Unlike the matter of jurisdiction venue was (and remains) a privilege personal to each defendant, which can be waived, and is waived by him unless timely objection is interposed.") (citation omitted).

257.  *See, e.g.*, 15 U.S.C. § 45b(e)(5) (2012) (permitting "any action brought under paragraph (1)" to be brought in "the district court of the United States that meets applicable requirements relating to venue under section 1391 of title 28").

258.  *See* Hoffman v. Blaski, 363 U.S. 335, 341 n.10 (1960) (comparing the venue provision for patent infringement lawsuits with the general venue provision codified in 28 U.S.C. § 1391).

259.  *See, e.g.*, Int'l Refugee Org. v. Bank of Am. Nat'l Tr. & Sav. Ass'n, 86 F. Supp. 884, 886 (S.D.N.Y. 1949) (finding section 1391 inapplicable).

venue provision that broadens the range of courts where a plaintiff may sue restricts a defendant's power.[260]

Section 1132(e)(2) falls squarely into the latter category. At the time of enactment, ERISA narrowed defendants' check and returned greater venue choice to plaintiffs. Pre-ERISA, section 1391 limited a plaintiff suing in diversity to "the judicial district where all plaintiffs or all defendants reside, or in which the claim arose," while in all other cases, a plaintiff could file in a district where "all defendants reside" or "where the claim arose."[261] In contrast, section 1132(e)(2) expanded the range of venues by authorizing suit "in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, . . . "[262] This change significantly enhanced plaintiffs' capacity to enforce their rights. For example, take a case where a plaintiff wanted to sue two defendants residing in different districts. Under 1391 circa 1974, no venue would satisfy the "all defendants reside" provision. Under ERISA, however, the plaintiff could sue in either district based on a single defendant's residence in that venue.[263]

The choice of venue options is one means Congress adopted to empower employees to enforce their benefit rights.[264] The phrase "ready access" is not a decision rule or standard for gauging a plaintiff's access to the federal courts. Rather, it is a description of what section 1132 does by its operation: courts comply with the "ready access" language by allowing participants and beneficiaries to choose from section 1132's venue options at filing. Section 1001(b) provides no other benchmark to assess "ready access to the Federal

---

260.  *See, e.g.*, Lipp v. Nat'l Screen Serv. Corp., 95 F. Supp. 66, 69–70 (E.D. Pa. 1950) ("The venue provisions of the anti-trust laws were enacted to give anti-trust plaintiffs special venue privileges in addition to those granted by general venue statutes . . . they were intended to facilitate the prosecution of anti-trust actions, not to replace or make unavailable general venue provisions.") (*citing* U.S. v. Nat'l City Lines, 334 U.S. 573 (1948)).

261.  28 U.S.C. § 1391(a) (as enacted Nov. 2, 1966).

262.  29 U.S.C. § 1132(e)(2) (2012).

263.  Some courts fail to recognize the significance of ERISA's expansion of plaintiffs' venue options. *See, e.g.*, Turner v. Sedgwick Claims Mgmt. Servs., Inc., No. 7:14-CV-1244-LSC, 2015 WL 225495, at *11 (N.D. Al. Jan. 15, 2015) (presuming ERISA section 502(e)(2) was only "incrementally broader" than section 1391). At the time of ERISA's enactment, informed observers took a different view. *See supra* note 136 and accompanying text.

264.  Just as ERISA's statutory provisions "provid[e] for appropriate" "remedies" and "sanctions," section 1001(b) declares that ERISA's statutory provisions "provid[e] for appropriate . . . ready access to the Federal courts." 29 U.S.C. § 1001(b) (2012); *see also* Boggs v. Boggs, 520 U.S. 833, 845 (1997) (noting, with respect to §§ 1001(b) & 1001(c), "[t]he general policy is implemented by ERISA's specific provisions").

courts" than the operation of ERISA's statutory provisions by their terms.[265] Accordingly, just as a court should not ignore a remedy afforded by ERISA, it cannot ignore the venue options made available by ERISA.

A comparison with Congress's declaration of policy in section 1001(c) illustrates this point. Section 1001(c) declares a congressional policy to "protect the interests [of employees] by improving the equitable character and the soundness of [private pension] plans by requiring them to vest the accrued benefits of employees with *significant* periods of service . . . ."[266] The reference to "*significant* periods of service" does not purport to create a benchmark for courts to apply in determining whether a particular employee ought to be vested in her benefit accruals. Rather, it describes what ERISA's vesting rules do by their operation, namely, "vest the accrued benefits of employees with significant periods of service."[267] The job of a court is to enforce the vesting rules as written to ensure the rules can serve the function for which Congress adopted them.

The same is true for sections 1001 and 1132.[268] Courts ensure ERISA's venue rules serve the function for which Congress adopted them by permitting beneficiaries and participants to decide, at filing, which section 1132 venue best serves to enforce their benefit rights. Any other approach denies employees the "ready access to the Federal courts" Congress meant them to have. Notwithstanding these textual cues, however, most courts enforce forum selection clauses. In doing so, they cut loose from the statutory text and substitute their own watered down concepts of "ready access," thereby replacing congressional mandate with judicial whim. Each of these new constructions, however, is questionable.

First, some courts conclude that a forum selection clause does not conflict with ERISA as long as the clause permits an employee to sue in a

---

265. Where Congress meant to delegate the courts authority to exercise judgment in the application of statutory remedies it did so expressly. *See* 29 U.S.C. §§ 1109(a) and 1132(a)(2), (3), (4), (5) (2012) (illustrating how the word "appropriate" specifies a standard to guide judicial discretion in the implementation of particular remedial provisions). *See, e.g.*, Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 249–53 (2000) (explaining how the word "appropriate" contributes to the limiting effect of the phrase "appropriate equitable relief" in 29 U.S.C. § 1132(a)(3) and thereby provides courts guidance on the remedy available).

266. 29 U.S.C. § 1001(c) (2012) (emphasis added).

267. 29 U.S.C. § 1053(a) (2012); *see also Boggs*, 520 U.S. at 845 ("The general policy is implemented by ERISA's specific provisions.").

268. 29 U.S.C. §§ 1001, 1132 (2012).

federal court.[269] Take *In re Mathias*.[270] Upholding a forum selection clause that forced an ERISA plaintiff to litigate over 700 miles from his home,[271] the Seventh Circuit relies on the Sixth Circuit's opinion in *Smith v. Aegon* for the proposition "forum-selection clauses channeling litigation to a particular federal court preserve ready access to federal court, consistent with the general policy expressed in section 1001(b)."[272] Under this line of reasoning, access to some federal court—even one not named in section 1132(e)(2)—counts as "ready access to the Federal courts," thereby rendering the modifier "ready" superfluous.[273] But as Justice Scalia admonished in *Mertens v. Hewitt Associates*, courts should "not read [a] statute to render the modifier superfluous."[274]

Moreover, the reasoning in *Smith v. Aegon* hangs on a slender reed. To support its conclusion, the court cites a district court's bald assertion that "a contractual venue provision 'certainly does not conflict with ERISA's provision for "ready access to the federal courts."'"[275] The underlying premise of such a conclusion is that the phrase "ready access" creates a decision rule that licenses judges to substitute their own ideas of what counts as "ready access" rather than applying section 1132.[276] Thus, these courts bootstrap their way to their preferred result instead of confronting ERISA's enacted text and declared purpose.

A second tack courts take is to treat section 1132(e)(2) as "permissive," then enforce a forum selection clause so long as employees may sue in a

---

269. *See, e.g.*, Smith v. Aegon Cos. Pension Plan, 769 F.3d 922, 931 ("[N]either Smith nor the Secretary explains how a venue provision inhibits ready access to federal courts when it provides for venue in a federal court."); Feather v. SSM Health Care, 216 F. Supp. 3d 934, 941 (S.D. Ill. 2016) ("the forum selection clause is not inconsistent with the policy rationales of ERISA because it does not inhibit Feather's access to federal courts when it provides for venue in a federal court."

270. 867 F.3d 727 (7th Cir. 2017).

271. *See id.* at 729 & n.2 (transferring case from Pennsylvania to Illinois); *see also* Mathias Petition for Writ of Cert., Mathias v. U.S. Dist. Ct.,2017 WL 5564204, at *I (S. Ct. Nov.14, 2017).

272. *Mathias*, 867 F.3d at 732 (citing *Smith*, 769 F.3d at 931).

273. *See* Harris v. BP Corp. N. Am., Inc., No. 15 C 10299, 2016 WL 8193539, at *6 (N.D. Ill. Sept. 8, 2016) ("This Court declines to read '*ready* access' out of ERISA's stated goal of providing 'ready access to the Federal courts.'") (emphasis in original).

274. Mertens v. Hewitt Assocs., 508 U.S. 248, 248 (1993).

275. *Smith*, 769 F.3d at 931 (quoting Smith v. Aegon USA, L.L.C., 770 F. Supp. 2d 809, 812 (W.D. Va. 2011)).

276. Even if the reference to "ready access" could be understood to be a decision rule, the standard the *Feather* court used would be wrong. It renders the "ready" in "ready access" superfluous. *See infra* notes **Error! Bookmark not defined.**-273.

district court described in section 1132(e)(2).[277] These courts negate Congress's rebalancing of venue options. In 1974, as today, many benefit plans operated nationwide, and many employees lived hundreds or thousands of miles from where their plan was administered or where a putative defendant "reside[d] or [might] be found."[278] Lawmakers saw how difficult it might be for employees in this position to enforce a claim for benefits.[279] For this reason, Congress gave employees a wide range of venue options and the power to choose among them at filing. Taking the language in section 1001(b) at face value, then, "the interest of participants in employee benefit plans and their beneficiaries" are best protected when they make the choice Congress

---

277. *See, e.g.*, Mathias v. Caterpillar, Inc., 203 F. Supp. 3d 570, 578 (E.D. Pa. 2016); Price v. PBG Hourly Pension Plan, No. 12-15028, 2013 WL 1563573, at *2 (E.D. Mich. Apr. 15, 2013); Rodriguez v. Pepsico Long Term Disability Plan, 716 F. Supp. 2d 855, 861 (N.D. Cal. 2010); Laasko v. Xerox Corp., 566 F. Supp. 2d 1018, 1023 (C.D. Cal. 2008); Klotz v. Xerox Corp., 519 F. Supp. 2d 430, 436 (S.D.N.Y. 2007) (noting that "nothing in ERISA's statutory text or legislative history" prevents narrowing to one of the three in section 1132(e)(2)); Smith v. Aegon Cos. Pension Plan, No. 3-12-CV-697-H, 2013 WL 321632, at *3 (W.D. Ky. Jan. 28, 2013) (finding no conflict because clause requires suit in court described in 1132(e)(2)).

278. *See, e.g.*, George v. Lewis, 204 F. Supp. 380, 382 (D. Colo. 1964) (Colorado plaintiffs suing pension trust administered in Washington, D.C.).

279. Recall Senator Javits's comments to the Senate upon introducing the first bill to include the broad venue language in section 1132(e)(2) of ERISA, the Nixon Administration's 1970 fiduciary reform legislation: "[I]n the case of *plans covering employees and beneficiaries in many States*, service of process, venue, and jurisdictional requirements compound even further the difficulty facing individual employees who might want to institute a suit to protect their rights under present law. The administration bill which I am introducing today is specifically designed to remedy these defects . . . ." 116 CONG. REC. 7279 (1970) (emphasis added). It is clear from opinions in litigation involving the United Mine Workers Welfare and Retirement Fund that federal judges also understood that many employees did not have "ready access" to the courts where a plan was administered. *Two months after ERISA's enactment*, the Sixth Circuit rejected the Fund's attempt to use the trust-of-movables doctrine to force the plaintiff-miners to sue in Washington, D.C., where the trust was administered. The court quoted and endorsed the following passage from *Rittenberry v. Lewis*, 222 F. Supp. 717, 721-22 (E.D. Tenn. 1963):

> "When a trust seeks to operate upon a nationwide basis, as does the Welfare Fund here, with 1,500,000 beneficiaries scattered across the nation, it is difficult to understand how a rule of convenience in the law of administration of trusts could so dominate the judicial mind as to cause it to disregard the rights and convenience of 1,500,000 beneficiaries across the nation in favor of a rule that accords a theoretical uniformity of instruction to the trustee. Under such a rule the Fund could locate in Hawaii, where presumably no miners live, and for all practical purposes escape any court supervision of the rights of the beneficiaries. *To a destitute and disabled miner in Tennessee, Washington, D.C. can be about equally unavailable as Hawaii.*"

Miller v. Davis, 507 F.2d 308, 317-18 (6th Cir. 1974) (emphasis added).

provided in section 1132(e)(2).[280]  Allowing employers to choose revives the very obstacles Congress sought to eliminate by passing ERISA.[281]

Decisions that invoke the "permissive" character of section 1132(e)(2) also misunderstand the function of the phrase "may be brought."  As we explained above, Congress used this phrase to give employees a broader range of venue options.  28 U.S.C. section 1391 has long authorized venue in a list of courts "[e]xcept as otherwise provided by law."[282]  The words "may be brought" indicate that section 1132(e)(2) supplements rather than supplants section 1391.  As a result, employees can sue to enforce benefit rights in a federal district court that satisfies section 1391 or section 1132(e)(2).[283]

Third, courts also enforce forum selection clauses on different, but related, grounds.  These courts presume forum selection clauses to be an employee's exercise of venue options before any claim arises.[284]  The Supreme Court has accepted such a characterization in a context not involving a contrary public policy.[285]  In such a case, Justice Alito writes in *Atlantic Marine*, the parties "waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."[286]  In the ERISA context, this approach would allow employers to hand-pick[287] the site of litigation without regard to the resulting

---

280. 29 U.S.C § 1001(b) (2012).

281. Harris v. BP Corp. N. Am., Case No. 15 C 10299, 2016 WL 8193539, at *6 (N.D. Ill. Sept. 8, 2016) (forcing an employee "to litigate her claim in an inconvenient location seems hardly consistent with ERISA's purpose of removing procedural obstacles that have 'hampered effective enforcement of fiduciary duties.'").

282. 28 U.S.C. § 1391(a) (2012).  The phrase "except as otherwise provided by law" appeared in section 1391 at the time of ERISA's enactment.  *See* Pub. L. No. 89–714, 80 Stat. 1111 (amending 28 U.S.C. § 1391(a) [venue in cases "founded only on diversity of citizenship"] and (b) [venue in cases "not founded solely on diversity of citizenship"]).  This phrasing also appeared in 28 U.S.C. § 1391 when Congress adopted it in 1948.  *See* Act of June 25, 1948, ch. 646, § 1, 62 Stat. 935 (current version at 28 U.S.C. § 1391(c) (2011)).

283. *See* 14 Charles Alan Wright, et al., Federal Practice and Procedure § 3803.1 (4th ed. 2018).  Even though section 1132(e)(2) venues may completely encompass those in section 1391, the "may be brought" ensures that ERISA plaintiffs benefit when section 1391 provides venues not available under section 1132(e)(2).  *Id.*

284. *See, e.g., In re* Mathias, 867 F.3d 727, 731 (7th Cir. 2017) ("Although ERISA plans are a special kind of contract and courts are attentive to the statutory goal of protecting beneficiaries, an ERISA plan is nonetheless a contract." (citations omitted)).

285. *See, e.g.,* Atl. Marine Constr. Co. v. U.S. Dist. Ct., 571 U.S. 49, 63 (2013) ("[W]hen a plaintiff agrees by contract to bring suit only in a specified forum—presumably in exchange for other binding promises by the defendant—the plaintiff has effectively exercised its 'venue privilege' before a dispute arises.").

286. *Atl. Marine,* 571 U.S. at 64.

287. The Sixth Circuit acknowledges as much in *Smith v. Aegon Companies Pension Plan* when it describes the court mandated by the venue-selection clause in AEGON's pension

difficulties for employees.[288]   Congress's statutorily declared "policy . . . to protect . . . the interests of [employees] . . . .by providing for . . . ready access to the Federal courts" cannot be reconciled with such a result.[289]

Forum selection clauses impose procedural obstacles of the sort Congress put to rest in 1974.   Enforcement of these clauses contravenes ERISA's declared policy and the textual implementation of this policy.[290] Accordingly, ERISA invalidates venue-selection clauses across the board.

## CONCLUSION

The purpose of forum selection clauses is, by definition, to allow a defendant to forum shop.  Courts have willingly traded the pernicious impact of such clauses for the illusory gains of contractual autonomy.  While scholars have long bemoaned this decision, forum selection clauses are endemic.  That does not mean, however, that such clauses should go unchallenged.  Supreme Court authority has repeatedly maintained such clauses cannot supersede public policy.

Perhaps ERISA provides the clearest example of such a policy.  As we detailed, multiple avenues of statutory interpretation support a narrative of ERISA that runs fully counter to the prevailing trend toward enforcing such clauses.  The drafters of ERISA sought to protect employees by clearing obstacles to the federal courts.  The statutory text, the legislative history, and the historical context each confirm this clear policy goal.  Rather than defer to this policy, the majority of courts are either ignoring or misinterpreting ERISA.

Freedom of contract, legitimate or questionable depending on the parties' relative bargaining strength, should not override Congressional regulatory intent.  Invalidating forum selection clauses in ERISA cases is a

---

plan as "*AEGON's chosen* venue."  Smith v. Aegon Cos. Pension Plan, 769 F.3d 922, 932 (6th Cir. 2014) (emphasis added).

288. Justice Alito's holding in *Atlantic Marine* that a plaintiff "effectively exercised [her] 'venue privilege' before a dispute arises" should not extend to ERISA plans.  Atl. Marine Constr. Co. v. U.S. Dist. Ct., 571 U.S. 49, 63 (2013).  Benefit plans commonly involve long-term relationships and "[p]lan administrators and employers 'are generally free . . . , for any reason at any time to adopt, modify, or terminate benefit plans."  *Smith*, 769 F.3d at 930 (6th Cir. 2014).  An employee has no choice in the matter, particularly when a plan adds a clause subsequent to an employee's retirement or onset of disability. *See, e.g.*, *id.* at 930 (noting plan amended forum selection clause seven years after benefits commenced); *see also supra* note 87 (discussing additional examples).

289. 29 U.S.C § 1001(b) (2012).  *See supra* Part II and accompanying text.

290. *Id.*

first step toward redirecting courts back to giving employees the protection
Congress intended.