Michelle C. Yau, *pro hac vice*
Scott M. Lempert, *pro hac vice*
Jamie L. Bowers, *pro hac vice*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Carolyn G. Anderson (MN No. 275712)
June P. Hoidal (MN No. 033330X)
Charles R. Toomajian (MN No. 0397879)
ZIMMERMAN REED LLP
1100 IDS Center, 80 South 8th Street
Minneapolis, Minnesota 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Yvonne Becker, Christopher Nobles, and Rosa Ramirez,<br><br>        Plaintiffs,<br><br>vs.<br><br>Wells Fargo & Co.; Employee Benefit Review Committee; Wells Fargo Bank, National Association; and Galliard Capital Management, Inc.,<br><br>        Defendants. | Case No. 0:20-cv-02016 (DWF/BRT)<br><br>**[CORRECTED] AMENDED CLASS ACTION COMPLAINT** |

## I.      NATURE OF THE ACTION

1.      This is a civil enforcement action brought pursuant to Sections 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3), for violations of ERISA's fiduciary duty and prohibited transactions provisions. It is brought as a class action by Yvonne Becker, Christopher Nobles, and Rosa Ramirez (collectively referred to as "**Plaintiffs**"), all of whom are participants in the Wells Fargo & Company 401(k) Plan (the "**Plan**" or "**Wells Fargo**

**Plan**"). Plaintiffs bring this action on behalf of all participants and beneficiaries in the Plan during the Class Period.

2.      This suit is about corporate self-dealing at the expense of the retirement savings of company employees. Defendants are all fiduciaries of the Wells Fargo Plan, who are required by ERISA to act prudently and solely in the interest of the Plan's participants when choosing the investment options for the Plan menu.

3.      ERISA fiduciaries are bound to act with an "eye single" to the interest of the plan participants and beneficiaries to whom they owe a duty. *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Defendants in this case violated that bedrock principle by favoring the economic interests of Wells Fargo & Company ("**Wells Fargo**" or "**Wells Fargo & Co.**") over those of the Plan participants to whom they owe the highest duty.

## II.      JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1).

5.      ERISA permits an action in a district where the plan is administered, where the breach took place, or where a defendant resides or may be found. 29 U.S.C. § 1132(e)(2).

6.      Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District.

7.      This Court has personal jurisdiction over Wells Fargo & Co. because it transacts business in, employs people, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

8.     This Court has personal jurisdiction over Wells Fargo Bank, National Association because it transacts business in, employs people, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

9.     This Court has personal jurisdiction over the Employee Benefit Review Committee because it transacts business in and has significant contacts with this District, and because ERISA provides for nationwide service of process.

10.     This Court has personal jurisdiction over Galliard Capital Management, Inc. because it transacts business in and has significant contacts with this District, and because ERISA provides for nationwide service of process.

### III.     PARTIES

**A.     Plaintiffs**

11.     Plaintiff Yvonne Becker ("**Plaintiff Becker**") was an employee of Wells Fargo for approximately 26 years and resides in Martinez, California.

12.     Plaintiff Christopher Nobles ("**Plaintiff Nobles**") was an employee of Wells Fargo and resides in Fort Worth, Texas.

13.     Plaintiff Rosa Ramirez ("**Plaintiff Ramirez**") was an employee of Wells Fargo and resides in Indian Trail, North Carolina.

14.     Each of the Plaintiffs is a participant in the Wells Fargo Plan because each of them has a colorable claim to benefits under the Plan.

15.     Each of the Plaintiffs' individual accounts in the Plan was or is invested in the investment options offered under the Plan's investment menu in the Class Period, including one or more of the Wells Fargo proprietary funds offered by the Plan.

CORRECTED AMENDED COMPLAINT

16.     Plaintiffs, like substantially all Plan participants, were not provided any information regarding the substance of deliberations, if any, of the Employee Benefit Review Committee, concerning the Plan's menu of investment options or selection of service providers during the Class Period.

17.     Plaintiffs otherwise had no knowledge of the substance of the Employee Benefit Review Committee's deliberations.

18.     Each of the Plaintiffs discovered his/her claims shortly before commencing or joining this action.

**B.      Defendants**

19.     Every employee benefit plan must provide for one or more named fiduciaries that jointly or severally possess the authority to control and manage the operation and administration of the plan. 29 U.S.C. § 1102(a)(1). Further, a person who functions as a fiduciary is a fiduciary, even if he or she is not named as such, so long as the person exercises any discretionary authority or control over the administration of the plan or any authority or control over the disposition of plan assets. 29 U.S.C. §1001(21)(A).

(1)     <u>Defendant Wells Fargo & Co.</u>

20.     Defendant Wells Fargo & Co. is a Delaware company with its principal place of business located at 420 Montgomery Street, San Francisco, California 94104. Wells Fargo and its affiliates provide diversified financial services, including wholesale banking, mortgage banking, consumer finance, equipment leasing, agricultural finance, commercial finance, securities brokerage and investment banking, computer and data processing

CORRECTED AMENDED COMPLAINT

services, trust services, investment advisory services, mortgage-backed securities servicing and venture capital investment.

21.     Defendant Wells Fargo & Co. is the Plan Sponsor within the meaning of 29 U.S.C. § 1002(16)(B).

22.     Defendant Wells Fargo & Co.  is also a party in interest to the Plan within the meaning of 29 U.S.C. §1002(14) because, among other things, it is an employer whose employees are covered by the Plan.

### (2)     Employee Benefit Review Committee

23.     **Defendant Employee Benefit Review Committee** ("**EBRC**" or the "**Committee**") is a named fiduciary within the meaning of 29 U.S.C. § 1102(a) with the authority to manage the assets of the Plan.

24.     **John and Jane Does 1-20.** At the time the Complaint was filed, Plaintiff did not know the identity of the Plan's fiduciaries who served on the Employee Benefit Review Committee. The parties are discussing the identification by name of the John and Jane Does 1-20.

25.     The Employee Benefit Review Committee and its individual members during the Class Period, currently named as John and Jane Does 1-20, are collectively referred to as the "**Committee Defendants**" or the "**EBRC Defendants**".

26.     The Committee Defendants were responsible for selecting and monitoring the investment options available through the Plan during the Class Period.

27.     During the Class Period, the Committee Defendants added several Wells Fargo products as investment options for participants in the Plan.

28.     As such, during the Class Period, the Committee Defendants were/are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A)(i) because they (1) exercised discretionary authority or discretionary control respecting management of the Plan and (2) exercised authority or control respecting management or disposition of its assets.

29.     The Committee Defendants were/are also fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A)(iii) by virtue of their discretionary authority or discretionary responsibility over the administration of the Plan.

(3)     Defendant Wells Fargo Bank, National Association

30.     The Plan was/is invested in a series of "collective investment trusts" ("**CITs**")[1] sponsored by Defendant Wells Fargo Bank, National Association ( "**Wells Fargo Bank**")

31.     Wells Fargo Bank is the trustee to the CITs.

32.     The Committee Defendants authorized Wells Fargo Bank to have exclusive management, with respect to the acquisition, investment, reinvestment, holding, or disposition of any securities or other property at any time held by it and constituting part of any Plan's assets within the CITs.

33.     The powers and authority granted to Wells Fargo Bank are set forth in a declaration of trust titled "Wells Fargo Bank, N.A. Collective Investment Trust Funds for Employee Benefit Trusts" ("**Declaration of Trust**").

---

[1] A CIT is a pooled investment vehicle similar to a mutual fund, but is exempt from registration under the Investment Company Act of 1940 and the associated disclosure requirements.

CORRECTED AMENDED COMPLAINT

34.     Pursuant to IRS Rev. Ruling 81-100, which provides that qualified retirement plans may pool their assets for investment purposes if certain requirements are met, the Committee Defendants granted Wells Fargo Bank exclusive management authority with respect to the CITs by adopting the Declaration of Trust as part of the Plan.

35.     This Declaration of Trust provides that each trust (i.e., each CIT) "is created and organized in the United States and is maintained at all times as a domestic trust in the United States. The terms, provisions, and effect of this Declaration of Trust shall be construed and enforced according to the laws of the State of California to the extent not preempted by ERISA, the rules and regulations prevailing from time to time of the Comptroller of the Currency and any applicable rules and regulations of the Board of Governors of the Federal Reserve System, all of which shall be deemed to be part of this Declaration of Trust."

36.     The Declaration of Trust states that the Trustee, Wells Fargo Bank, is a co-fiduciary of the Plan.

37.     During the Class Period, Wells Fargo Bank was/is a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A)(i) because it exercised discretionary authority or discretionary control respecting management of the Plan.

38.     During the Class Period, Wells Fargo Bank was/is a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A)(i) based on its control over the Plan's assets held in the CITs. *See* 29 C.F.R. § 2510.3-101(a).

CORRECTED AMENDED COMPLAINT

39.     Wells Fargo Bank was/is a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A)(iii) by virtue of its discretionary authority or discretionary responsibility over the administration of the Plan.

40.     Wells Fargo Bank is also a party in interest to the Plan within the meaning of 29 U.S.C. §1002(14) because, among other things, it is an employer whose employees are covered by the Plan.

(4)     Defendant Galliard Capital Management, Inc.

41.     **Galliard Capital Management, Inc.** ("**Galliard**"), was/is a registered investment advisor and a wholly-owned subsidiary of Defendants Wells Fargo Bank and Wells Fargo throughout the Class Period.

42.     The Committee Defendants appointed and maintained Galliard as an investment manager (as that term is defined in Section 3(38) of ERISA, 29 U.S.C. § 1002(38)) to invest and manage the Plan assets, during the Class Period.

43.     Galliard is a fiduciary of the Wells Fargo Plan, as defined in ERISA § 3(38), 29 U.S.C. § 1002(38), with full discretionary authority to manage and invest the Plan's assets held in the Wells Fargo Stable Value Fund.

44.     As a fiduciary of the Plan, Galliard was and continues to be a party-in-interest to the Plan under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A).

45.     Because Galliard provided and continues to provide services to the Plan, it was and continues to be a party-in-interest to the Plan under ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

CORRECTED AMENDED COMPLAINT

## IV.   FACTS

### A.   The Plan

46.     The Plan is a tax-qualified defined contribution pension plan subject to the provisions of ERISA. At all relevant times, the Plan was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A).

47.     Wells Fargo is the sponsor of the Plan. As Plan sponsor, Wells Fargo intended for the Plan to encourage savings and provide retirement income for Wells Fargo employees and former employees and their beneficiaries.

48.     The Plan covers eligible employees of Wells Fargo, including all subsidiaries of Wells Fargo with U.S.-based employees.

49.     The Plan's benefits are funded by participants' voluntary tax-deferred contributions and by employer matching contributions. The Plan is intended to qualify under Internal Revenue Code § 401(k).

50.     Participants in the Plan can direct the investment of all the assets allocated to their respective individual accounts in the Plan, and the return on those investments is credited to each participant's account. Participants can only invest in the fund options selected for the Plan by the Committee Defendants.

51.     The value of each participant's individual account in the Plan depends on contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of fees and expenses. Participants pay fees and expenses (both direct and indirect) based on the fund options selected and maintained by the fiduciaries of the Plan.

CORRECTED AMENDED COMPLAINT

52.     As of December 31, 2019, the Plan had approximately $48 billion in assets and 340,353 participants. Each year, thousands of Wells Fargo employees and former employees contribute, on average and in the aggregate, over $1.5 billion of their income to the Plan.

53.     The Plan is one of the largest defined contribution plans in the country. Combined with the investment sophistication of all the Plan fiduciaries and their unique access to information, the Plan and its fiduciaries have enormous bargaining power to receive superior investment products and services at extraordinarily low cost.

**B.     Defendants Violated ERISA Duties Owed to the Plan Participants**

54.     ERISA strictly regulates the manner in which retirement plan fiduciaries must manage and administer the retirement assets under their management and/or control. Among other things, ERISA requires that fiduciaries act: a) prudently; b) solely in the interest of participants and beneficiaries; c) for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the plan; and d) in avoidance of prohibited transactions.

55.     ERISA's duty of prudence required the Committee Defendants to follow reasonable standards of investment due diligence by giving appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan, and then to act accordingly. 29 C.F.R. § 2550.404a-1.

CORRECTED AMENDED COMPLAINT

56.     ERISA's duty of loyalty required the Committee Defendants to ensure that Wells Fargo's business interests did not, in any way, influence decisions about the investments offered through the Plan.

57.     These duties of prudence and loyalty required the Committee Defendants to adequately consider non-proprietary funds that could be included on the Plan investment menu, as well as to carefully avoid conflicts of interests arising from profiting from Plan investments.

58.     The Committee Defendants also had and have ongoing monitoring duties with respect to the Plan's assets. These monitoring duties include: reviewing and re-evaluating the Plan's investment fund options on a regular and frequent basis (at least as frequently as every quarter) to ensure that they continue to be prudent investments for the Plan based on performance metrics and cost/fee structure; to not to give preferential treatment to Wells Fargo proprietary funds; and to remove investment options that either alone, or in the context of the entire Plan portfolio, were imprudent.

59.     As part of their monitoring duties, the Committee Defendants had a duty to remove imprudent or disloyal Plan menu options, such as options that underperformed and/or were more expensive relative to available alternatives; options that constituted prohibited transactions because they involved proscribed compensation to fiduciaries or parties in interest; and options that were selected based on preferential treatment for proprietary funds.

60.     However, the Committee Defendants selected and maintained investments for the Plan in a manner that benefited Wells Fargo & Co. (and its subsidiaries and

executives) rather than selecting and maintaining investments with an eye single to the interests of the Plan and its participants and beneficiaries, in dereliction of their ERISA fiduciary duties. This pattern and practice violated ERISA in a number of ways, and constituted prohibited transactions, as described in further detail below.

61.     Specifically, the Committee Defendants caused the Plan to invest in and retain the following Wells Fargo proprietary funds: Wells Fargo/State Street Target CITs, the Wells Fargo Causeway International Value Fund; the Wells Fargo Federated Total Return Bond Fund, the Wells Fargo Stable Value Fund, the Wells Fargo Treasury Money Market Fund, and the Wells Fargo Emerging Growth Fund (collectively referred to as the "proprietary funds").

        **(1)**    **The Committee Defendants Imprudently and Disloyally Disregarded Fiduciary Norms to Add and Retain Wells Fargo Investments for the Plan.**

62.     ERISA requires the Committee Defendants to engage in a thorough, unbiased deliberative process when selecting and monitoring investment options in the Plan. This process must always be scrupulous, but it is heightened when fiduciaries have the inherent conflict associated with executives of a financial services company, such as Wells Fargo & Co., investing employee retirement plan assets in its own proprietary funds.

63.     Because there is such a conflict here, the Committee Defendants are required to use the utmost care and unbiased procedures as a check against conflicted decision making, and must ensure that all investment decisions are made with an eye single to the interests of Plan participants and are not for Wells Fargo's business interest.

64.     The Committee Defendants failed to satisfy threshold procedural norms needed for a non-conflicted fiduciary to satisfy their duties of loyalty and prudence under ERISA. For instance, the Committee Defendants selected and retained Wells Fargo products over materially identical, yet cheaper, non-proprietary alternatives; selected Wells Fargo products that had no performance history that could form the basis of a fiduciary's objective decision-making process; and failed to remove proprietary funds despite sustained underperformance.

65.     The Committee Defendants also failed to adhere to the Plan's own Investment Policy Statement ("**IPS**"), which requires that, prior to selecting a new fund option for the Plan, the Committee evaluate certain qualitative and quantitative measures for potential new funds, including whether that new fund has demonstrated consistency in the investment of its assets according to its stated investment objective and the evaluation of the fund's historical performance measured against an appropriate market index and comparable universe of similar managers.

66.     The Committee Defendants' failures all served Wells Fargo's interests, as the selection of proprietary investments for the Plan provided earned Wells Fargo money, supported its asset management business, and/or provided seed money for Wells Fargo to launch new fund products.

### a)     The Target CITs

67.     In 2016, Wells Fargo Bank, N.A. established a new series of target date collective investment trusts called the "Wells Fargo/State Street Target CITs" (the "**Target**

CORRECTED AMENDED COMPLAINT

**CITs**"). The Target CITs were designed to invest the Plan's assets into a series of other Wells Fargo funds.

68.     In general, target date funds provide a "set it and forget it" investment option for retirement investors that do not want to actively manage their retirement savings. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the date on which the participant intends to retire and is typically part of the fund's name. For instance, "2030" target date funds are designed for individuals who intend to retire in the year 2030.

69.     The Target CITs were established under the Declaration of Trust.

70.     The Target CITs are the default option for Plan participants that do not select a specific investment option for their retirement savings in the Plan.

71.     All assets within the Target CITs are ERISA-governed "plan assets" within the meaning of 29 C.F.R. § 2510.3-101.

72.     Upon their creation in 2016, the Committee Defendants transferred the Plan's holdings in the Wells Fargo Dow Jones Target Date Funds into the Wells Fargo/State Street Target CITs , even though the Target CITs had no prior performance history or track record which could demonstrate that they were appropriate funds for the Plan. Despite the lack of a track record, the Committee Defendants "mapped," or transferred, nearly $5 billion of Plan participant retirement savings from the Wells Fargo Dow Jones Target Date Funds into the Target CITs.

73.     The Committee Defendants' decision to funnel Plan assets into untested, proprietary funds/CITs flouts fundamental standards of prudent investing. The Department

CORRECTED AMENDED COMPLAINT

of Labor has advised that, "[i]n general, plan fiduciaries should engage in an objective process to obtain information that will enable them to evaluate the prudence of any investment option made available under the plan. For example, in selecting a TDF [target date fund] you should consider prospectus information, such as information about performance (investment returns) and investment fees and expenses."[2]

74.     The Committee Defendants plainly did not (and necessarily could not) meet these threshold standards and the IPS's requirements, because no information about historical performance existed for the brand-new Wells Fargo/State Street Target CITs into which nearly $5 billion of Plan assets were transferred in 2016. In other words, the Plan fiduciaries had nothing to consider. At a minimum, prudent fiduciary process requires a three-year performance history for an investment option prior to its inclusion in a plan. Nonetheless, the Committee Defendants decided to include the newly-created proprietary funds to serve Wells Fargo's business interests in providing seed money for its new fund products.

75.     In transferring Plan assets in the Wells Fargo Dow Jones Target Funds into the newly-launched Wells Fargo/State Street Target CITs, the Committee Defendants served Wells Fargo's business interests at the expense of Plan participants and beneficiaries, and disregarded basic fiduciary process.

---

[2] Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries, U.S. Department of Labor Employee Benefits Security Administration, February 2013. https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf

CORRECTED AMENDED COMPLAINT

76.     In turn, the Target CITs invest the Plan's assets into other Wells Fargo funds, also CITs, such as the Wells Fargo/SSGA Global Equity Index Fund, the Wells Fargo/SSGA Global Bond Index Fund, and the Wells Fargo/BlackRock Short-term Investment Fund. Each of these three funds are Wells Fargo products that are marketed to outside investors and directly and/or indirectly pay fees to Wells Fargo.

77.     Like the Target CITs, the Wells Fargo/SSGA Global Equity Index Fund and Wells Fargo/SSGA Global Bond Index Fund had insufficient performance track-records to qualify them for investment under standards of prudence. For instance, the Wells Fargo/SSGA Global Bond Index Fund was included in the Plan (through the Target CITs) immediately upon creation in December 2016.

78.     To the best of Plaintiffs' knowledge based on available information, neither the glidepath nor the combination of indices underlying the Target CITs had been tested for "target-date" investing before the Committee Defendants added the Target CITs to the Plan. Nor had the Target CITs demonstrated consistency between their stated glidepath and investment strategy as opposed to their actual glidepath and investment strategy.

79.     At the time the Committee Defendants selected the Target CITs for the Plan, there were ample non-proprietary target date funds available with established performance track-records and lower costs than the Target CITs. For example, State Street Global Advisors sponsors a target date suite that it created in 2009 that is nearly 20% cheaper than the Target CITs.

80.     In addition to the fact that the Committee Defendants did not properly consider the performance of the CITs (which was non-existent) before transferring $5

billion of participants' assets into them, they also have failed to give appropriate consideration to the marked underperformance of these funds since their creation.

81.     This failure to appropriately consider the underperformance of these funds since their selection for the Plan violates the Department of Labor's prudence regulation, which requires fiduciaries to engage in investment due diligence by giving appropriate consideration to the funds' performance and then to act accordingly. 29 C.F.R. § 2550.404a-1.

82.     The Department of Labor's disclosure regulation, 29 C.F.R. § 2550.404a-5(d)(1)(3), requires Plan fiduciaries to disclose to participants' investment returns compared to an "appropriate broad-based securities market index," i.e. a benchmark, for all fund options in the Plan.

83.     Pursuant to 29 C.F.R. § 2550.404a-5(d)(1)(3), the Committee Defendants selected the Morningstar Lifetime Conservative Index as the appropriate broad-based securities market index for the Target CITs.

84.     The Target CITs dramatically underperformed their respective benchmarks that were selected by the Committee Defendants and disclosed to participants. In just one year, the Target CITs underperformed their benchmarks by over 2%.

85.     Indeed, since their inception, the Target CITs underperformed their benchmark by approximately 2%, causing over one-hundred million dollars in losses to participants' retirement savings. Despite this consistent underperformance, the availability of cheaper, non-proprietary funds, and the Committee Defendants' failure of process when

CORRECTED AMENDED COMPLAINT

selecting the investment, the Target CITs remain the default option for participants in the Plan.

86.     Because the Committee Defendants failed to consider the lack of a track record of the Target CITs before adding them to the Plan and then retained the funds despite sustained underperformance, Plaintiffs and other participants have lost over one hundred million dollars in retirement savings.

b)     Wells Fargo/Causeway International Value Fund

87.     A Plan participant that seeks exposure to international stocks has only one option in the Plan: the "International Fund," a fund-of-funds investment option, for which the Committee Defendants selected a series of funds into which participant investments in the International Fund flow.

88.     The Wells Fargo/Causeway International Value Fund (the "**WF Causeway Fund**") is one of the funds the International Fund invests in and is therefore a Plan investment.

89.     Based on the information currently available, the Committee Defendants were and are responsible for selecting the sub-funds that comprise the International Fund and thus were responsible for selecting the WF Causeway Fund as a Plan investment.

90.     The Committee Defendants included and retained the WF Causeway Fund as a Plan investment (via the International Fund), despite the availability of cheaper and materially identical alternative investments, to seed and prop up the WF Causeway Fund.

91.     The WF Causeway Fund is a CIT established under the Declaration of Trust.

CORRECTED AMENDED COMPLAINT

92.    All assets within the WF Causeway Fund are ERISA-governed "plan assets" within the meaning of 29 C.F.R. § 2510.3-101.

93.    The WF Causeway Fund was created on September 10, 2014 and was added to the International Fund option on the Plan investment menu on the first day that this new fund came into existence. The Plan was the very first investor in the WF Causeway Fund.

94.    As alleged above, prudent fiduciary process requires – at a minimum – a three-year performance history for an investment prior to its inclusion in a plan. Despite this, the Committee Defendants added the newly created proprietary fund, with no track record, to the Plan. They did this to serve Wells Fargo's business interests, by using Plan assets as seed money for the newly created and untested proprietary fund.

95.    The Committee Defendants failed to engage in a prudent process before adding the WF Causeway Fund as a Plan investment because they failed to consider the Fund's historical performance (which was non-existent) before adding it the Plan.

96.    The Committee Defendants also plainly did not (and necessarily could not) meet the IPS's requirements for the evaluation of a new fund because no information about historical performance existed for the brand-new WF Causeway Fund, which had not demonstrated adherence and consistency in implementation of the Fund's stated investment strategy.

97.    The Department of Labor has cautioned that a fiduciary violates his duty to participants where his fiduciary decision making is motivated by the intent to generate seed money that facilitates the marketing of a fund. *See* Department of Labor Advisory Opinion 1998-06A.

98.     Here, the Committee Defendants used the Plan's assets to seed the WF Causeway Fund, as evidenced by the fact that the Plan's assets constituted more than 50% of the total assets in the Fund at year-end 2014. Without such a substantial investment from the Plan, Wells Fargo's ability to market its new, untested fund would have been greatly diminished.

99.     An International Value Fund offered by Causeway Capital Management as a Separate Account ("the **Causeway International Separate Account**") is materially identical yet cheaper than the WF Causeway Fund.

100.    In fact, the reported strategies of the Causeway International Separate Account and the WF Causeway Fund are identical: both funds report that their strategy is to invest primarily in common stocks of companies located in developed countries outside the United States and that normally, the fund invests at least 80% of its total assets in stocks of companies located in at least ten foreign countries and invests the majority of its total assets in companies that pay dividends or repurchase their shares. Both the Causeway International Separate Account and the WF Causeway Fund report that they may invest up to 10% of its total assets in companies in emerging (less developed) markets.

101.    The expense ratio for the Causeway International Separate Account is 0.32%.

102.    The expense ratio of WF Causeway Fund is 0.556%. Wells Fargo is compensated with these fees.

103.    As illustrated in the following chart, the WF Causeway Fund is almost double the price of an identical Causeway International Separate Account.

CORRECTED AMENDED COMPLAINT



104.   Thus, the Committee Defendants seeded their WF Causeway Fund with the Plan's assets, and retained that proprietary fund as a Plan investment, even though a materially identical but cheaper non-proprietary alternative was available directly through Causeway and the WF proprietary fund was more expensive than benchmark fees charged by funds with the same strategy.

105.   The additional compensation paid to Wells Fargo through the Plan's investment in the WF Causeway Fund reduces the value of the retirement accounts/savings of participants invested in this fund.

106.   Pursuant to 29 C.F.R. § 2550.404a-5(d)(1)(3), Plan fiduciaries selected the MSCI EAFE Index (Net) benchmark as the "appropriate broad-based securities market index" for the WF International Value Fund. As illustrated below, the WF International Value Fund has substantially underperformed this benchmark, as well as the Causeway International Separate Account (which has an identical strategy), for the past five years.

CORRECTED AMENDED COMPLAINT



107.   Despite underperforming its benchmark (MSCI EAFE Index) and the Causeway International Separate Account on both a one year and five-year basis, the Committee Defendants retained the WF International Value Fund as a Plan investment.

108.   As a result of the Committee Defendants' breaches of fiduciary duty in selecting and retaining the WF International Value Fund as a Plan investment, the retirement accounts of participants invested in this fund grew approximately 10% less due to the Fund's underperformance compared to its benchmark.

109.   As a result of the Committee Defendants' conduct with respect to the WF Causeway Fund, the Plan has paid millions of dollars in excessive fees and lost millions of dollars through underperformance.

c)   <u>Wells Fargo Treasury Money Market Fund</u>

110.   Money market funds are intended to protect investors' principal investment and generate current income.

CORRECTED AMENDED COMPLAINT

111.    For this category of fund, the Committee Defendants selected and retained the Wells Fargo Treasury Money Market Mutual Fund (the "**WF Treasury Fund**") for the Plan without adequately considering non-proprietary alternatives. The WF Treasury Fund has remained an investment option in the Plan despite more than a decade of underperformance and high fees.

112.    Pursuant to 29 C.F.R. § 2550.404a-5(d)(1)(3), the Committee Defendants selected the FTSE 3-month Treasury Bill index as the "appropriate broad-based securities market index," i.e. the benchmark for the WF Treasury Fund.

113.    Before the start of the Class Period, the WF Treasury Fund had substantially underperformed its benchmark and multiple alternative investment options that invested in short maturity bond funds. As of March 31, 2013, the WF Treasury Fund underperformed its benchmark (FTSE 3-month Treasury Bill index) across one, five, and ten-year horizons. For instance, the WF Treasury Fund underperformed its benchmark by over 18% on annual average during the ten years preceding the Class Period.

114.    The performance issues plaguing the WF Treasury Fund continued through the Class Period and until the present. For example, the WF Treasury Fund underperformed its benchmark (FTSE 3-month Treasury Bill Index) every year since 2014, the start of the Class Period.

115.    Significantly, in 2014 and 2015, the WF Treasury Fund failed to meet its primary objective of protecting principal and generating current income. In both those years, the WF Treasury Fund generated no returns. At the same time, inflation rose at a rate of 1.7%. Thus, investors' principal lost real value.

CORRECTED AMENDED COMPLAINT

116.    In addition to the WF Treasury Fund's prolonged and significant underperformance, its fees are above average for money market funds. After fee waivers, the WF Treasury Fund charges an expense ratio of 0.2%. By contrast, the average fee level paid by plans with assets exceeding $1B for a money market fund was 0.14% according to the 2016 ICI Study.[3] The ICI Study noted fees trending downward. Therefore, the current average fee level for money market funds is likely lower than 0.14%.

117.    There was a robust market of alternative, non-proprietary funds that the Committee Defendants ignored in order to retain the underperforming and expensive WF Treasury Fund. For instance, Federated Investors offers an institutional separate account (the Government Liquidity Strategy) that invests in short-term government debt like the WF Treasury Fund. The Federated Government Liquidity Strategy is less than half the cost of the WF Treasury Fund and has outperformed the WF Treasury Fund every year during the Class Period.

118.    Numerous other service providers, including Fidelity's Money Market Treasury Portfolio, offer short-term government debt options like the WF Treasury Fund that are cheaper and have consistently performed better than the WF Treasury Fund.

119.    Notwithstanding the high fees and sustained poor performance of the WF Treasury Fund, which underperformed its own benchmark (the FTSE 3-month Treasury Bill index, *see supra*) chosen by Plan fiduciaries pursuant to 29 § C.F.R. 2550.404a-5(d)(1)(3), the Committee Defendants retained this proprietary Wells Fargo fund for the

---

[3] *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016* (June 2019) *available at*, https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

Plan. The Plan's total investment in the WF Treasury Fund was huge, totaling half a billion dollars by the end of 2016.

120.    As a result of the Committee Defendants' disloyal and imprudent conduct with respect to the WF Treasury Fund, the Plan has lost millions of dollars of retirement assets through excessive fees and sustained and significant underperformance.

d)      Wells Fargo Emerging Growth Fund

121.    A Plan participant that seeks exposure to small-cap stocks has only one option in the Plan: the "Small Cap Fund," a fund-of-funds investment option, through which the Committee Defendants selected a series of funds into which participant investments in the Small Cap Fund flow.

122.    The Wells Fargo Emerging Growth Mutual Fund (the "**WF Growth Fund**") is one of the funds the Small Cap Fund invests in and is therefore a Plan investment.

123.    Based on the information currently available, the Committee Defendants were and are responsible for selecting the sub-funds that comprise the Small Cap Fund and thus were responsible for selecting the WF Growth Fund as a Plan investment.

124.    The Committee Defendants included and retained the WF Growth Fund for the Plan through the Small Cap Fund. The Committee Defendants supported Well Fargo's struggling small-cap business by retaining the WF Growth Fund in the Plan, even though the fund is unreasonably expensive for one of the country's largest plans, has underperformed its benchmarks and widely accepted non-proprietary funds, and is unnecessary for the Small Cap Fund's strategy.

125.    However, the Committee Defendants did not need to include the WF Growth Fund as a component of the Small Cap Fund for the Small Cap Fund to meet its objective. The Small Cap Fund is comprised of five different funds: the WF Growth Fund and four non-proprietary components. In fact, the WF Growth Fund is duplicative of the Wellington Small Cap Growth Fund, which is one of the four non-proprietary components.

126.    Both the WF Growth Fund and Wellington Small Cap Growth Fund invest at least 80% of their net assets in equity securities of companies that exhibit signs of long-term growth and whose market capitalizations at the time of purchase are within the market capitalization range of companies included in the Russell 2000 Index or the S&P SmallCap 600 Index.

127.    The performance of both funds is highly correlated. Fund managers measure how much of their performance is explained by movements in its benchmark index using a statistical measure referred to as the "coefficient of determination" or "R-squared." Both funds have coefficients of determination with the Russell 2000 that exceed 90%; meaning that more than 90% of both funds' performance can be explained by changes in the Russell 2000 Index, rather than the managers' decisions.

128.    By including duplicative strategies, the Committee Defendants ensured that Wells Fargo would receive compensation from the Plan and that the Plan's assets would remain an anchor for the Growth Fund. But, in so doing, the Plan sacrificed economies of scale that would have lowered the expenses of other components in the Small Cap Fund.

129.    In addition, the Plan retained a sub-optimal fund that other institutional investors were dropping from their portfolios and plans throughout the Class Period. From

CORRECTED AMENDED COMPLAINT

the start of the Class Period until the present, the WF Growth Fund's investor base decreased by approximately 25%. This decline was due to outside investors leaving the fund.

130.   As other investors continued to pull their money from the WF Growth Fund, the Plan's massive investment in the Growth Fund was a lifeline to keep the WF Growth Fund commercially viable.

131.   Because of the significant rate at which outside investors left the WF Growth Fund, the Plan's investment in the fund became outsized. To the best of Plaintiffs' knowledge based on the available information, the Plan's investment in the WF Growth Fund represents approximately 30% of its total assets under management.

132.   The decline in external investment in the Growth Fund is explained by the high fees associated with the fund for large institutional investors, availability of cheaper investment vehicles, and availability of better performing alternatives.

133.   The 2016 ICI Study found the average expense ratio that plans with assets over $1 billion paid for domestic equity funds was 0.36%. By contrast, the WF Growth Fund, a domestic equity fund, has an expense ratio that is nearly 300% higher than that average: 0.9%.

134.   The Committee Defendants also failed to consider the availability of cheaper alternatives or investment vehicles for the WF Growth Fund.

135.   As illustrated in the following chart, there are a substantial number of cheaper, non-proprietary alternatives that have outperformed the WF Growth Fund. For instance, the T. Rowe Price Institutional Small-Cap Stock Fund, Triton Fund, and

Vanguard Explorer Fund are all actively managed small-cap growth funds like the WF Growth Fund. Each has a lower expense ratio than the WF Growth Fund, has outperformed the WF Growth Fund during the past five years, and has had sustained investor interest, unlike the WF Growth Fund.



136.   The WF Growth Fund also underperformed its benchmark. As illustrated in the following chart, between 2014 and the end of 2019, the Growth Fund underperformed both the Russell 2000 Growth and S&P 600 SmallCap Growth Indices.



CORRECTED AMENDED COMPLAINT

137.   Instead of acting in the participants' best interest and removing the WF Growth Fund, the Committee Defendants retained the fund to prop it up, as other investors fled the fund.

138.   As a result of the Committee Defendants' conduct with respect to the WF Growth Fund, Plaintiffs and other participants have lost millions of dollars in retirement assets through the payment of excessive fees and sustained and significant performance.

### (2)   Defendants Engaged in Self-Dealing and Caused Many Prohibited Transactions in Violation of ERISA

139.   ERISA fiduciaries have a duty to avoid transactions that are prohibited by ERISA. Through the many Wells Fargo proprietary funds selected and maintained for the Plan, Wells Fargo and its subsidiaries and affiliates earn fees from and use for their benefit the Plan's assets, which constitute prohibited transactions in violation of ERISA § 406(a) and (b), 29 U.S.C. § 1106(a) and (b), in a number of different ways.

140.   The Committee Defendants caused many violations of ERISA § 406(a) and (b) in order to provide Wells Fargo and its subsidiaries and affiliates substantial direct and indirect fees from the Plan's assets, which significantly reduced participants' retirement savings.

141.   Parties-in-interest are also liable for receiving fees which violate ERISA § 406.

### a)   Wells Fargo Subsidiaries Take Fees from the Plan's Assets Held in the Target CITs and the WF Stable Value Fund.

142.   The Committee Defendants selected several Wells Fargo proprietary funds as investment options in the Plan, including: the WF Causeway Fund (through the

International Equity Fund); the Wells Fargo Federated Total Return Bond Fund (through the Global Bond Fund), the Wells Fargo Stable Value Fund, the WF Treasury Fund, and the WF Growth Fund (through the Small Cap Fund).

143.    Specifically, the Committee Defendants caused the Plan to pay Wells Fargo Bank fees of 0.556% for the Wells Fargo International Value Fund and caused the Plan to pay fees of 0.164% to Wells Fargo Bank for the Wells Fargo Federated Total Return Bond Fund.

144.    Similarly, the Committee Defendants selected the Stable Value Fund as an investment option, which is a separately managed account that is managed by Galliard Capital Management, Inc., a subsidiary of Wells Fargo and thus caused the Plan to pay Wells Fargo fees of 0.198% per dollar invested in the Stable Value Fund (through Galliard).

145.    The Committee Defendants also caused the Plan to pay Wells Fargo fees of 0.90% for the WF Growth Fund.

146.    The Committee Defendants also caused the Plan to pay Wells Fargo fees of 0.20% for the WF Treasury Fund.

> b)    <u>Wells Fargo Takes Impermissible Fees from Plan Assets Through the WF STIFs</u>

147.    Each of the CITs is a "common or collective trust fund of a bank" within the meaning of 29 C.F.R. § 2510.3-101(h)(ii). The assets held in the CITs are therefore "plan assets" within the meaning of 29 CFR § 2510.3-101.

148.    The Target CITs, WF Causeway Fund, and the Wells Fargo Federated Total Return Bond Fund are established and governed under the Declaration of Trust, which

CORRECTED AMENDED COMPLAINT

grants Wells Fargo Bank "exclusive management, with respect to the acquisition, investment, reinvestment, holding, or disposition of any securities or other property at any time held by it and constituting part of any" CIT. And that management authority is "absolute and uncontrolled" and binding upon the Plan, participants, and the Committee Defendants.

149.   Through the Declaration of Trust, the Committee Defendants agreed that Wells Fargo Bank "may charge a reasonable fee for its management and administration of [the CITs] and withdraw the amount thereof from the [CITs]."

150.   Wells Fargo Bank used its management authority over the CITs to invest the CITs (and the Plan assets therein) into the Wells Fargo/BlackRock Short-Term Investment Fund and/or the Wells Fargo Stable Return Fund (collectively, "**WF STIFs**"), both of which pay additional fees to Wells Fargo Bank.

151.   Wells Fargo Bank also determines how much of the Plan's assets are invested in the WF STIFs and the duration for which they will remain invested therein.

152.   The Stable Value Fund is not registered as an investment company under the Investment Company Act of 1940 and all of the assets therein were invested by the Plan. The assets held in the Stable Value Fund are therefore "plan assets" within the meaning of 29 CFR § 2510.3-101.

153.   Similarly, Galliard invests some of the assets within the WF Stable Value Fund in the WF STIFs.

154.    On behalf of the Stable Value Fund, the Wells Fargo subsidiary, Galliard, determines how much of the Plan's assets are invested in the WF STIFs and the duration for which they will remain invested therein.

155.    Each of the WF STIFs is itself a "common or collective trust fund of a bank" within the meaning of 29 CFR § 2510.3-101(h)(ii). The assets held therein are therefore ERISA "plan assets" within the meaning of 29 CFR § 2510.3-101.

156.    Wells Fargo Bank uses its discretion over the WF STIFs to take Plan assets held therein to compensate itself for managing the WF STIFs. Specifically, Wells Fargo Bank pays itself 0.08% per dollar invested in the Wells Fargo/BlackRock Short-Term Investment Fund and 0.18% per dollar invested in the Wells Fargo Stable Return Fund as compensation for managing the WF STIFs.

c)    Wells Fargo Retains Float Income Earned on Plan Assets Held in the WF STIFs.

157.    "Float" is the practice where uninvested cash in a fund is used to earn interest.

158.    Wells Fargo Bank used its control over the Plan's assets held in the WF STIFs to generate "float" income from uninvested cash held in these funds.

159.    However, rather than remitting the "float" income earned from Plan assets back to the Plan, Wells Fargo Bank keeps the "float" income for itself. As a result, Wells Fargo Bank enriched itself at the expense of the Plan and to the detriment of Plaintiffs' and other participants' retirement savings.

## V.    CLASS ALLEGATIONS

160.    Plaintiffs bring this action on behalf of the following Class:

> All participants and beneficiaries in the Wells Fargo & Company
> 401(k) Plan from March 13, 2014 through the date of judgment.
> Any individual Defendants are excluded from the class.

161.   Class certification is appropriate under Federal Rule of Civil Procedure 23(a) and (b)(1) and/or (b)(3).

162.   **Numerosity.**  The Class satisfies the numerosity requirement because it is composed of thousands of persons. The Plan currently has more than 340,353 participants. The number of Class members is so large that joinder of all its members is impracticable.

163.   **Commonality.**  As to the members of the Class, this case presents numerous common questions of law and fact, among them:

(a)   Whether the Committee Defendants were and are ERISA fiduciaries responsible for selecting, retaining, removing and monitoring the Plan investments;

(b)   Whether the Committee Defendants breached their ERISA fiduciary duties in monitoring or failing to monitor the investment options in the Plan during the Class Period;

(c)   Whether the Committee Defendants breached their ERISA fiduciary duties in selecting additional Wells Fargo proprietary fund options for the Plan during the Class Period;

(d)   Whether the Committee Defendants, Wells Fargo Bank, and/or Galliard caused the Plan to engage in multiple prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106, throughout the Class Period;

(e)   Whether the Plan and its participants suffered losses as a result of Defendants' fiduciary breaches and prohibited transactions.

164.   **Typicality.**  Plaintiffs' claims are typical of the claims of the Plan Class because (a) to the extent that Plaintiffs seek relief on behalf of the Plan pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), their claims are not only typical of, but the same as, a claim under § 502(a)(2) brought by any other Class Member; (b) to the extent

CORRECTED AMENDED COMPLAINT

that Plaintiffs seek equitable relief, that relief would affect all Class Members equally; all of the Class members were injured and continue to be injured in the same manner by the alleged breaches of fiduciary duty. Plaintiffs have no interests that are antagonistic to the claims of the Class. They understand that this matter cannot be settled without the Court's approval.

165.   **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the Class and are committed to the vigorous representation of the Class. Plaintiffs retained counsel, Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein") and Zimmerman Reed LLP ("Zimmerman Reed"), who are experienced in class action and ERISA litigation, and Plaintiffs have no interests antagonistic to or in conflict with the interests of the Class.

166.   Plaintiffs' counsel has agreed to advance the costs of the litigation contingent upon the outcome. Counsel are aware that no fee can be awarded without the Court's approval.

167.   A class action is the superior method for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable. The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.

168.   Moreover, the fiduciary defendants to the Plan named herein were and are obligated to treat all Class members similarly because ERISA imposes uniform standards of conduct on fiduciaries. Individual proceedings, therefore, would pose the risk of

inconsistent adjudications. Plaintiffs are unaware of any difficulty in the management of this action as a class action.

169.    The Class may be certified under Federal Rule of Civil Procedure 23(b).

A.    **Rule 23(b)(1) requirements.**  As an ERISA breach of fiduciary duty action, this action is a classic Rule 23(b)(1) class action. Prosecution of separate actions by individual members would create the risk of (i) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants, or (ii) adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.    **Rule 23(b)(2) requirements**.  Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Here, the challenged conduct at issue—Defendants' investment of plan assets and improper use thereof—not only can be, but must be enjoined or declared unlawful only as to all of the Class members or as to none of them.  Because the focus of Plaintiffs' claims is on Defendants' actions, and because the relief sought is equitable plan-wide relief, there are simply no individual issues. The requirements for Rule 23(b)(2) certification are plainly met.

C.    **Rule 23(b)(3) requirements**.  This action is suitable to proceed as a class

action under Rule 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter.

## VI.   CAUSES OF ACTION

### Count I
Breach of Fiduciary Duties for Failing to Prudently and Loyally Select and Monitor Investments for the Plan in Violation of ERISA § 404, 29 U.S.C. § 1104
(Against Committee Defendants)

170.   Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

171.   At all relevant times, the Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). As fiduciaries, they had a duty to act solely in the interest of the participants and beneficiaries of the Plan and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" in accordance with ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A).

172.   The Committee Defendants further were required "to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," in accordance with ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). These fiduciary duties include the ongoing duty

to monitor all plan investments and remove imprudent or disloyal investments from the Plan's menu.

173.   ERISA's duty of prudence required the Committee Defendants to follow reasonable standards of investment due diligence by giving appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan, and then to act accordingly. 29 C.F.R. § 2550.404a-1.

174.   The Committee Defendants further were required to "discharge [their] duties. . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter [ERISA §§ 2-734, 29 U.S.C. §§ 1001-1191(c)]," which includes a duty to follow the terms of the Plan's Investment Policy Statement. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D); *see also Tussey v. ABB, Inc.*, 2012 WL 1113291, at *14 (W.D. Mo. Mar. 31, 2012) ("Statements of investment policy issued by a named fiduciary authorized to appoint investment managers would be part of the 'documents and instruments governing the plan' within the meaning of ERISA § 404(a)(1)(D).") (quoting 29 C.F.R. § 2509.94–2); *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042-43 (9th Cir. 2001) (holding that fiduciaries are required to comply with written statements of investment policy).

175.   As set forth in detail above, the Committee Defendants breached these fiduciary duties by, inter alia:

a.  Selecting the Target CITs and WF Causeway Fund without considering the funds' lack of any performance history and/or glidepath track record, that the funds had not yet demonstrated their ability to consistently follow their stated investment objective, the availability of cheaper, better performing alternatives, or their inherent conflict;

b.  Choosing to maintain Wells Fargo proprietary funds as investment options for the Plan without adequately considering non-proprietary funds that did not have excessive expenses and which performed better than the Wells Fargo funds;

c.  Failing to monitor the Plan investment options and remove Wells Fargo-affiliated funds by, among other things: (i) giving preferential treatment to Wells Fargo-proprietary funds; (ii) failing to avoid conflicts of interest; (iii) failing to adequately consider non-proprietary funds which did not have unnecessary fund layering and excessive fees and expenses, and which performed better than the Wells Fargo funds; (iv) failing to remove Wells Fargo proprietary funds from the Plan which were selected based on an imprudent and disloyal process which gave preferential treatment to Wells Fargo funds; and (v) failing to adequately consider whether continuing to invest Plan assets in Wells Fargo proprietary funds constituted party-in-interest transactions.

176.  As a direct and proximate result of the above breaches of fiduciary duties, the Plan and its participants have suffered hundreds of millions of dollars of losses in

CORRECTED AMENDED COMPLAINT

retirement assets, for which all Defendants named in this Count are jointly and severally liable.

177.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a participant or beneficiary to bring a civil action "for appropriate relief under section 1109 of this title."

178.   ERISA § 409(a), 29 U.S.C. § 1109(a), mandates that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

179.   Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and §1109(a), Plaintiffs seek all available and appropriate remedies against the Committee Defendants to redress violations of 29 U.S.C. § 1104 described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

180.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

181.   Pursuant ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate equitable relief against the Committee Defendants to redress the

CORRECTED AMENDED COMPLAINT

violations of ERISA § 1104, 29 U.S.C. § 1104, described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

**Count II**
Violations of ERISA § 406(a), 29 U.S.C. § 1106(a) for
Engaging in Prohibited Transactions
(Against Committee Defendants, Wells Fargo Bank and Galliard)

182.   Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

183.   ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits transactions that constitute direct or indirect sale or exchange of property between a plan and any parties in interest and prohibits fiduciaries from causing the plan to engage in such transactions.

184.   The Committee Defendants caused the Plan to engage in multiple party-in-interest transactions, by causing the Plan to repeatedly purchase and sell property (i.e., interests in Wells Fargo proprietary funds) from Wells Fargo (which holds legal title to the Wells Fargo mutual fund assets) and/or WFB (which holds legal title to the Wells Fargo CIT assets). Each purchase and sale by the Plan of units, shares, or interests in the Wells Fargo proprietary funds during the Class Period constituted a separate violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A).

185.   Wells Fargo Bank caused the CITs holding the Plan's assets to engage in multiple party-in-interest transactions, namely causing the Plan, through the CITs, to repeatedly purchase interests in other Wells Fargo CITs from itself, as Wells Fargo Bank is the trustee of all the Wells Fargo CITs. Each time Wells Fargo Bank caused the Plan

CORRECTED AMENDED COMPLAINT

(through a CIT) to purchase an interest in other Wells Fargo funds during the Class Period, this constituted a separate violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A).

186. Galliard caused the Stable Value Fund (which held/holds the Plan's assets) to engage in multiple party-in-interest transactions by repeatedly causing the Plan to purchase interests in the WF STIFs from Wells Fargo Bank which is the Trustee of the WF STIFs. Each purchase by the Stable Value Fund (holding the Plan's assets) of an interest in the WF STIFs during the Class Period constituted a separate violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A).

187. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits transactions that constitute direct or indirect transfers of a plan assets to, or use of a plan's assets by or for the benefit of, parties in interest, and prohibits fiduciaries from causing a plan to engage in such transactions.

188. The Committee Defendants, Wells Fargo Bank, and Galliard caused the Plan to engage in multiple violations of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), by causing the repeated transfer of Plan assets directly and/or indirectly to Wells Fargo Bank, Galliard, and Wells Fargo & Co. (all parties in interest), in the form of various direct or indirect fees, which constituted multiple, knowing violations of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

189. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a participant or beneficiary to bring a civil action "for appropriate relief under section 1109 of this title."

190. ERISA § 409(a), 29 U.S.C. § 1109(a), mandates that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or

duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

191.   Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and §1109(a), Plaintiffs seek all available and appropriate remedies against the Committee Defendants, Wells Fargo Bank and Galliard to redress violations of ERISA § 406(a), 29 U.S.C. § 1106(a), described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

192.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

193.   Pursuant ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate equitable relief against the Committee Defendants, Wells Fargo Bank and Galliard to redress the violations of ERISA § 406(a), 29 U.S.C. § 1106(a), described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

**Count III**
Violations of ERISA §406(b), 29 U.S.C. § 1106(b)
(Against Committee Defendants, Wells Fargo Bank and Galliard**)**

194.   ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account".

195.   ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) prohibits a fiduciary from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

196.   By virtue of their positions as fiduciaries of the Plan, the Committee Defendants made decisions about the investment of the Plan's assets in ways that benefitted themselves or were in their own self-interest because: (a) Wells Fargo received many direct and indirect fees and other compensation from the Plan's investment in Wells Fargo proprietary funds; (b) the commercial viability of the proprietary funds improved with increased assets under management including from the Plan's investments; and/or (c) the Defendants were all Wells Fargo executives whose compensation and promotion levels increased when they acted to increase revenue for Wells Fargo.

197.   The Committee Defendants' decisions based on Wells Fargo's and their own self-interest violated ERISA § 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3).

198.   By virtue of the control and authority granted to them by the Committee Defendants, Wells Fargo Bank and Galliard made decisions about the investment and use of the Plan's assets in ways that benefitted themselves or were in their own self-interest because: (a) both Wells Fargo Bank and Galliard transferred Plan assets to themselves as compensation; (b) both Wells Fargo Bank and Galliard invested or otherwise used Plan

CORRECTED AMENDED COMPLAINT

assets in a manner that earned themselves, Wells Fargo & Co., and/or their affiliates additional compensation.

199.   Wells Fargo Bank and Galliard made decisions based on Wells Fargo's and their own self-interest in violation of ERISA § 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3). As a direct and proximate result of the above violations of ERISA § 406(b)(1) and (3), 29 U.S.C. § 1106(b)(1) and (3), the Plan and its participants have suffered hundreds of millions of dollars of losses in retirement assets, for which all Defendants named in this Count are jointly and severally liable.

200.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a participant or beneficiary to bring a civil action "for appropriate relief under section 1109 of this title."

201.   ERISA § 409(a), 29 U.S.C. § 1109(a), mandates that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

202.   Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and §1109(a), Plaintiffs seek all available and appropriate remedies against the Committee Defendants, Wells Fargo Bank and Galliard to redress violations of ERISA § 406(b), 29 U.S.C. § 1106(b), described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

CORRECTED AMENDED COMPLAINT

203.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

204.    Pursuant ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate equitable relief against the Committee Defendants, Wells Fargo Bank and Galliard to redress the violations of ERISA § 406(b), 29 U.S.C. § 1106(b), described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

**Count IV**
Violations of ERISA §406(a), 29 U.S.C. § 1106(a) for
Engaging in Prohibited Transactions
(Against Defendant Wells Fargo & Co.)

205.    Plaintiffs restate and incorporate the allegations of the preceding paragraphs as if set forth fully herein.

206.    Wells Fargo & Co. is a party-in-interest to the Plan because, among other things, it is an employer whose employees are covered by the Plan. ERISA § 3(14)(c), 29 U.S.C. § 1002(14)(C).

207.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits transactions that constitute the direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

208.    The Wells Fargo Plan's assets were repeatedly transferred to Wells Fargo & Co. as fees or compensation for the Wells Fargo affiliated funds in the Plan that were managed by Wells Fargo Bank, Galliard, and/or their subsidiaries or other affiliates of Wells Fargo & Co. Each of those direct or indirect transfers of the Plan's assets to Wells Fargo & Co. constitutes a violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

209.    As a party-in-interest, Wells Fargo & Co. is liable for knowing participation in the direct and indirect transfers of the Plan's assets into its account under ERISA § 506(a)(3), 29 U.S.C. § 1132(a)(3). *Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.*, 120 S.Ct. 2180 (2000).

210.    Because it received the Plan's assets in its own account and retains records of those transfers, Wells Fargo & Co. had and has actual or constructive knowledge of all of the violations of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), described above.

211.    In particular, Wells Fargo & Co. knew or should have known that the transfers from the Wells Fargo Plan were transfers of "plan assets" subject to ERISA because Wells Fargo & Co. is in fact the sponsor of the Wells Fargo Plan and it knew or should have known that the Plan must comply with ERISA in order for Wells Fargo's employer contributions to avoid income taxes, which they did.

212.    Wells Fargo & Co. knew or should have known that the transfers of compensation from the Plan to Wells Fargo & Co. violated ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), because it discloses in its governmental filings with the Department of Labor that the Plan engages in "party-in-interest" transactions for the Wells Fargo affiliated funds that the Plan invests in.

213.  Because Wells Fargo & Co. repeatedly received the Wells Fargo Plan's assets into its own account, Wells Fargo & Co. participated in all the prohibited transfers that violated ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

214.  The Plan's assets that were transferred to Wells Fargo & Co. in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), were transferred into an account belonging to Wells Fargo & Co. and based on the information currently available, the ill-gotten funds remain in such account.

215.  Alternatively, the balance of the Wells Fargo & Co. account wherein the prohibited transfers were deposited has at all relevant times remained above the total value of illegal transfers because (i) Wells Fargo & Co. reported to shareholders between $16 million to $23 billion in their cash account, and (ii) Plaintiffs estimate that the total value of the illegal transfers represents 0.001 of the balance of Wells Fargo & Co.'s account.

216.  Wells Fargo & Co. maintains detailed financial and accounting records that would enable Plaintiffs to trace the transfer of assets from the Plan or its investments to Wells Fargo & Co.

217.  ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

218.  Pursuant ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Wells Fargo & Co. is liable as a party-in-interest to disgorge to the Plan any ill-gotten profits and/or assets it

CORRECTED AMENDED COMPLAINT

received as a result of the repeated violations of 29 U.S.C. § 1106(a)(1)(D). Plaintiffs seek all available and appropriate equitable relief against Wells Fargo & Co. to redress the violations of 29 U.S.C. § 1106(a) described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

## VII.   <u>PRAYER FOR RELIEF</u>

Plaintiffs, on behalf of the Plan and the Class, respectfully request that the Court award the following relief for all Counts:

a.  A declaration that the Committee Defendants, Defendant Wells Fargo Bank, and Defendant Galliard have breached their fiduciary duties to the Class in the manner described herein;

b.  Order each fiduciary found to have breached his/her/its fiduciary duty to the Plan to jointly and severally pay such amount or surcharge to the Plan as is necessary to make the Plan whole for any losses which resulted from said breaches, plus pre-judgement and post-judgment interest;

c.  Order that all fiduciaries and parties-in interest disgorge and pay to Plan participants any profits obtained from violations of 29 U.S.C. § 1104, 1105, or 1106;

d.  Equitable liens on all ill-gotten profits obtained by parties-in-interest;

e.  Order Defendants to provide all accountings necessary to determine the amounts Defendants must remit to the Plan under ERISA § 409, 29 U.S.C. § 1109(a), to restore losses and any profits fiduciaries obtained from the use of Plan assets or other violations of 29 U.S.C. § 1104, 1105, or 1106;

CORRECTED AMENDED COMPLAINT

f.  To the extent necessary, issue an injunction or order creating a constructive trust into which all ill-gotten gains, fees and/or profits paid to any of the Defendants in violation of ERISA shall be placed for the sole benefit of the Plan and its participants and beneficiaries. This includes, but is not limited to, the ill-gotten gains, fees and/or profits paid to any of the Defendants that have been wrongly obtained as a result of breaches of fiduciary duty or prohibited transactions or other violations of ERISA.

g.  Issue an injunction removing the fiduciaries who have breached their fiduciary duties their roles as fiduciaries for the Plan, and an order appointing an independent fiduciary to manage the assets of the Plan;

h.  Issue an injunction requiring all fiduciaries to avoid all prohibited transactions and future ERISA violations, including but not limited to removing all Wells Fargo affiliated funds from the Plan;

i.  An award of pre-judgment interest on any amounts awarded to Plaintiffs and the Class pursuant to law;

j.  Certify the Class, appoint Plaintiffs as Class representatives, and appoint Cohen Milstein and Feinberg Jackson as Class Counsel;

k.  An award of Plaintiffs' attorneys' fees, expenses and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine;

CORRECTED AMENDED COMPLAINT

l.   An order awarding, declaring or otherwise providing Plaintiffs and the Class

any other appropriate equitable relief under ERISA § 502(a), 29 U.S.C.

§ 1132(a), or any other applicable law, that the Court deems just and proper.


Dated: May 28, 2021        By:  /s/ June P. Hoidal
_____

COHEN MILSTEIN SELLERS & TOLL PLLC
Michelle C. Yau, *pro hac vice*
Scott M. Lempert, *pro hac vice*
Jamie L. Bowers, *pro hac vice*
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
myau@cohenmilstein.com
slempert@cohenmilstein.com
jbowers@cohenmilstein.com

ZIMMERMAN REED LLP
Carolyn G. Anderson (MN No. 275712)
June P. Hoidal (MN No. 033330X)
Charles R. Toomajian (MN No. 0397879)
1100 IDS Center, 80 South 8th Street
Minneapolis, Minnesota 55402
(612) 341-0400
Carolyn.Anderson@zimmreed.com
June.Hoidal@zimmreed.com
Charles.Toomajian@zimmreed.com

***Attorneys for Plaintiffs***

CORRECTED AMENDED COMPLAINT